2015 IL App (2d) 140530
No. 2-14-0530
Opinion filed May 28, 2015

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF LORENA K. MILLER, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Petitioner-Appellant, | ) ) | |
| and | ) ) | No. 05-D-313 |
| JEFFREY A. MILLER, | ) ) | Honorable Rene Cruz, |
| Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices McLaren and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1    Respondent, Jeffrey A. Miller, petitioned the trial court pursuant to section 510(c) of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/510(c) (West 2012)) for the termination of maintenance payments to petitioner, Lorena K. Miller. The trial court granted the petition, finding petitioner was cohabiting with Michael Meyers on a resident, continuing, and conjugal basis. In reaching this determination, the court considered Facebook pictures and posts written by Lorena and Michael, but it did not consider posts written by third parties. The court stated that the posts were relevant to its consideration of how Lorena and Michael presented their relationship to others. The court also allowed Jeffrey to submit several financial documents over Lorena's hearsay objection. The court did not reach the question of

modification of maintenance, which each party had raised as an alternative. Lorena appeals. For the reasons that follow, it was not improper for the court to consider the Facebook posts. Likewise, Lorena's argument concerning the financial documents fails.

¶ 2    However, the trial court's overall finding that Lorena cohabited with Michael so as to have a *de facto* marriage, as opposed to an intimate dating relationship, was against the manifest weight of the evidence. The six-factor analysis that the trial court applied is insufficient to distinguish an intimate dating relationship from a *de facto* marriage if unaccompanied by an understanding that the facts falling into each category must achieve a gravitas akin to marital behavior. The common-law standard of a *de facto* marriage is codified more precisely as cohabitation (with its three elements being resident, continuing, and conjugal). Therefore, while mindful that each case will present unique circumstances, we note that here the *absence* of certain traditional components of a marital relationship, such as intended permanence and mutual commitment (speaking to the continuing and conjugal elements), a shared day-to-day existence (speaking to the conjugal and residential elements), and the shared use and maintenance of material resources (speaking to the residential element), created a significant hurdle for Jeffrey. The trial court did not adequately consider the gravity (or lack thereof) of facts that fell into each of the six categories, nor did it adequately consider the absence of certain traditional components of a marital relationship. Though we defer to the trial court's assessment of the underlying facts, those facts do not establish a *de facto* marriage as required to permanently terminate maintenance. We thus reverse and remand.

¶ 3                                    I. BACKGROUND

¶ 4    In 2007, Lorena and Jeffrey divorced after 25 years of marriage. They had three children, all of whom had reached the age of majority and two of whom were past their college years. The

court split all nonretirement marital assets 55/45 in favor of Lorena. It split all retirement assets 50/50. Jeffrey, who was the founder and CEO of a corporation, was ordered to pay permanent maintenance at a rate of 41.44% of his income for the first four years, and 21.44% of his income thereafter. This would be accomplished by paying Lorena $3,000 monthly, with an annual "true-up" depending upon the size of Jeffrey's bonus. However, the court capped at $500,000 the total amount from which the true-up was to be calculated. Therefore, although Jeffrey earned as much as $800,000-plus per year following the divorce, Lorena's annual maintenance was ultimately capped at $107,200 ($500,000 x 21.44%).

¶ 5    Both parties started dating prior to the finalization of the divorce. Jeffrey remarried that same year. Lorena joined "Match.com" and went on dates with three different men, including Michael. By 2007, she entered into an exclusive dating relationship with Michael.

¶ 6    In February 2013, Jeffrey petitioned to terminate maintenance pursuant to section 510(c), arguing that Lorena cohabited with Michael on a resident, continuing, and conjugal basis. 750 ILCS 5/510(c) (West 2012). In the alternative, Jeffrey petitioned to modify maintenance pursuant to section 510(a), arguing that Lorena had not made reasonable efforts to become economically self-sufficient. 750 ILCS 5/510(a) (West 2012).

¶ 7    On December 12, 2013, before the court had ruled on Jeffrey's petition, Lorena petitioned to increase maintenance pursuant to section 510(a). *Id*. She argued that there had been a substantial change in circumstances, in that: (1) although the court contemplated in its dissolution judgment that Lorena would obtain a four-year degree and then a job, and although Lorena did in fact obtain a four-year degree, she had been unable to gain employment; (2) Jeffrey's income had increased since the divorce; and (3) Lorena's cost of living had increased due to inflation.

¶ 8    On December 17, 2013, the trial court began a multiday hearing on the petitions. Lorena testified that, when she married Jeffrey 32 years ago, she had only a high school diploma. She worked as a bank teller until she had their first child. Around that time, the family moved to London for Jeffrey's job. They stayed in London for several years. Lorena did not work outside the home while in London. Instead, she ran the household. Back in the United States, Lorena continued to stay home with the children. When the children were older, Lorena studied to obtain a Realtor's license. In her best year, she grossed $50,000. However, she ran her own office and, after accounting for overhead, she netted only $15,000. She last worked as a Realtor in the early 2000's. Jeffrey essentially confirmed this timeline.

¶ 9    Lorena joined "Match.com" in 2006, after the marriage had deteriorated. She connected with Michael over golf and music. Michael began spending the night at Lorena's home approximately twice per month. Eventually, according to Michael, the frequency increased such that he spent 70% of his weekends at Lorena's home. (Lorena equivocally testified that the frequency was lower).

¶ 10    In 2011, Lorena purchased a $245,000 townhome on a Lake in the Hills golf course. She wanted to be on this particular golf course, in part because the golf club allowed nonmarried partners to share a joint membership. A joint membership saved the members thousands of dollars per year *vis a vis* two individual memberships. She and Michael looked into several golf clubs, and this was the only club in the area that offered joint memberships to nonmarried applicants. The club termed these nonmarried members "significant others."

¶ 11    Lorena and Michael developed a weekly routine. Michael arrived at Lorena's home late Thursday evening, after playing with a band (Lisle band) at a restaurant and bar called Mullen's. As confirmed by Michael, Lorena never went to observe the Lisle band. Michael never woke

Lorena up when he arrived late. Sometimes, he would quietly slip into her room to sleep, but other times he would take one of the two guest rooms. On Friday, Michael would work from Lorena's house. This saved him an hour commute. However, Lorena occupied herself on Fridays, usually working toward her degree. Additionally, though uncorroborated, Lorena testified that she went to church on most Sundays, without Michael. On most weekends, Lorena and Michael played golf. They did not always golf together; they mixed it up with friends. When the weather was poor, such as in the winter months, Michael came over only two weekends per month.

¶ 12    When Michael was not at Lorena's for the weekend, and during the rest of the week, he resided at his own home in Wadsworth. With rare exceptions, Lorena did not sleep at his house. Approximately six times over the course of their relationship, Lorena, Michael, and several friends went to Ravinia. On those occasions, Lorena would stay at Michael's home because it was closer.

¶ 13    Over the course of the six-year relationship, Lorena and Michael went on approximately 14 trips together, usually sleeping in the same bed. In fact, Lorena went on only two trips outside of Illinois that did not include Michael: one girls' weekend and one mother-daughter trip. On one occasion, Lorena won a six-day trip to Lake Tahoe. The prize had to be used within two weeks, or it would expire. Lorena invited both a girlfriend and Michael. Only Michael could come, and he paid for his own flight. On most trips, however, other friends were also present. For example, each year, they went to Pebble Beach to volunteer at a golf tournament. On these trips, they socialized with a group of golfing buddies. On at least one of the Pebble Beach trips, they stayed in a room with another couple and split the costs four ways. Similarly, they participated in tournaments in Door County. Twice, they went to an annual blues festival in

Colorado. About six times, they went to Indianapolis to watch Butler University basketball and to visit Michael's daughter. Michael's daughter attended school at Butler, so, when in Indianapolis, they took her out to dinner. On three occasions, they went to Florida. On one trip, they traveled separately. Each met up with his or her own respective children, and, on some nights, they shared dinners. On each of the trips, Lorena and Michael each paid their own expenses and split the costs of meals.

¶ 14 Lorena and Michael celebrated some occasions together. They spent two out of six Christmases and two out of six Thanksgivings together. On Thanksgiving in 2012, they took a "family style" photo together, with Michael's daughter and granddaughter and Lorena's youngest son. They put the camera on a self-timer and sat on the couch. The picture was admitted into evidence both as an individual photograph and as a Facebook post. Lorena bought Christmas presents for Michael. The most expensive present she ever bought for him was a set of decorative framed vinyl records. Lorena also helped organize a 60th birthday party for Michael. The party was held in the golf course club room. Lorena paid for about one-half of the cost of the party. Additionally, Michael organized a baby shower for his daughter at the club room, and Lorena attended. Michael attended Lorena's son's 2008 high school graduation and his 2012 college graduation.

¶ 15 According to both Lorena and Michael, in 2007 or 2008, soon after Michael and Lorena started dating, Michael brought up the subject of marriage but did not ask Lorena to marry him. Lorena told him that she was not looking for marriage at that time. She explained that she had just endured a difficult divorce. She advised Michael not to raise the topic again; it would be raised, if ever, only by her. Lorena and Michael both testified that, in the fall of 2011, the romantic "spark" between them began to fade. Neither recalled engaging in sexual intercourse

after that time. However, Jeffrey arguably impeached Lorena on this point, establishing that, when Lorena was asked during a 2013 deposition how long it had been since she and Michael had engaged in sexual intercourse, she answered, "I don't know; it's been months." For a period, Lorena and Michael's relationship was strained, but, throughout 2011 and 2012, they continued to share the golf club membership, spend weekends together, and take trips together. At trial, Lorena characterized Michael as a friend. Likewise, Michael characterized Lorena as "a friend [whom] I admire." By the fall of 2013, however, Lorena believed that the relationship was over in all respects. In September 2013, Michael lost his job, terminated his golf club membership, and stopped spending weekends at Lorena's house.

¶ 16    Over the course of the relationship, the parties did not commingle finances. Neither party helped the other with housing costs or household chores (although Michael did pick up after Lorena's dog on weekends). Neither party had keys to the other's house or car. Neither party named the other as a beneficiary to any financial accounts or insurance policies. With the exception of a letter concerning their shared golf cart, Michael did not receive mail at Lorena's home. Each party paid for his or her own meals, travel expenses, and entertainment. Minor points of contention on this issue concerned the degree to which Michael saved gas money by working from Lorena's house on Fridays and the degree to which each saved money by entering into a joint golf club membership and sharing a golf cart and its costs.

¶ 17    Jeffrey called several of Lorena and Michael's mutual friends to testify. Thomas Detelich testified that he met Michael several years ago through Lorena. He and his wife, Diane, socialized with Lorena and Michael about once per month. Lorena socialized with Diane weekly. Florence Brennan also testified that she met Michael several years ago through Lorena. She socialized with the two of them several times, golfing, going out to dinner, and listening to

Michael's jazz group (Elgin band). Michael confirmed that, before he and Lorena began dating, they had no mutual friends. And, over the course of the relationship, they developed several mutual friends.

¶ 18    Lorena's neighbor, Valerie McDonough, testified on behalf of Jeffrey. Between the spring of 2011 and the spring of 2013, Valerie saw Michael's car outside Lorena's residence on 85 to 90% of Friday mornings. She often saw Lorena and Michael riding together in a golf cart. She occasionally saw Michael grilling in the back yard.

¶ 19    Lorena tried to establish that Valerie was biased by eliciting from Valerie that Valerie shares an acquaintance-like friendship with Jeffrey and Jeffrey's new wife. Valerie participates in social activities with Jeffrey and his new wife at the Elgin Country Club. Additionally, Valerie has socialized with Jeffrey and his new wife outside the club on at least one occasion. Valerie stated that she would be happy if Lorena moved out of the neighborhood: "That would be great. It would be fine. If she is unhappy there, she can leave." When mail concerning Lorena and Michael's shared golf cart came to Valerie's home by mistake, Valerie took a picture of it for Jeffrey before returning it to Lorena and Michael. When Lorena's dog defecated on Valerie's property, Valerie called the police. When Lorena cut down a tree in her own yard, Valerie complained to Lorena in person and then called the homeowners' association (who told Valerie that Lorena was free to cut down the tree).

¶ 20    Jeffrey submitted into evidence several photographs of Lorena and Michael together. These included pictures from a Thanksgiving holiday, Lorena's and Jeffrey's son's graduations, a game-watching night along with Michael's ex-wife, country club parties, Michael's 60th birthday party, several music festivals, and several golf outings.

¶ 21    Jeffrey sought to admit into evidence several computer-printed pages from both

Michael's and Lorena's Facebook profiles. Exhibit No. 8 contains 8 pages from a 20-page string from Michael's profile ("Page 1 of 20" is followed immediately by "Page 12 of 20"). Exhibit No. 9 contains 28 pages from a string of 64 pages from Michael's profile. Exhibit No. 5 contains 3 pages from Lorena's account, and exhibit No. 6 contains 11 pages from Lorena's profile. Some pages had only one pertinent post amidst comments from other Facebook friends.

¶ 22    As to "status" postings by Lorena and Michael, on January 30, 2012, Lorena displayed a status that read: "In a relationship with Michael Meyers." Below the status post was a picture of Lorena and Michael in casual clothing. Michael's arm was around Lorena's shoulder. Lorena testified that she did not remember posting the status herself, implying perhaps that Michael posted it and it fed to her profile. She did not really understand how Facebook worked. Sometime in February 2013, shortly after Jeffrey petitioned to terminate maintenance, Lorena asked Michael to take the relationship status off of his Facebook profile. Michael believed that Lorena changed the status on her own profile to "divorced".

¶ 23    The "nonstatus" posts are as follows. In November 2008, Lorena and Michael became "friends" on Facebook. Also in November 2008, Michael posted, "Michael Meyers is planning a Thanksgiving dinner with Lori." In December 2008, Michael posted an album with pictures of himself and Lorena golfing. In August 2009, Michael posted, "Back from Tahoe vacation [with Lorena], so sad! Had a great time, let's do it again!" In November 2009, Michael posted: "playing the course backwards ***. Follow that with 9 hole with my sweetie, what a day!" In March 2010, Michael posted, "Went to Gene and Judes for lunch with Lori, who became an expert by ordering our hotdogs. [Two] onions, [no] peppers." In June and in October 2010, Michael posted an album of pictures from golf trips he and Lorena had taken together. In August 2010, Lorena posted a message on Michael's profile about a Ravinia event: "Where's the

videotape from the Ravinia night? I want to play it over and over again. Great Musicians, fabulous event." In November 2010, Michael posted that he was going to see his daughter, and Lorena responded: "Your little girl is growing into a lovely lady. You have much to be proud of." In January and December 2010, Michael posted a picture of Lorena's dog, in one post trying to find it a new home. In January 23, 2010, Michael posted a picture of himself, Lorena, and another man, which he labeled "Lori and Mike." Also in January 2010, Michael posted that he was trying to quit smoking, and six people commented, including Lorena, who asked: "How you doing day 4?" In April and in November 2011, Lorena posted group photos that included Michael as well as several other people. In June 2012, Lorena posted a video of Michael's daughter and granddaughter. Also in June 2012, Lorena issued a post wishing Michael a happy Father's Day. In August 2012, Lorena posted a picture of Michael playing in the Elgin band. In September 2012, Lorena posted a picture of herself and Michael at a "Cheeseburger in Paradise" party at the golf club. On December 24, 2012, Lorena posted the previously described Thanksgiving picture depicting herself, her son, Michael, Michael's daughter, and Michael's granddaughter. Above the picture, she wrote: "Merry Christmas to my dear friends and family."

¶ 24    Lorena objected to the admission of the Facebook evidence, calling it hearsay. She pointed to a 2010 third-party post wherein one of Michael's friends stated, "Glad you and Lori could join us for Thanksgiving yesterday." She noted that, without that friend's testimony, the post constituted hearsay. Jeffrey argued that he was not offering the Facebook posts for the truth of what they asserted. He was not offering the posts to show that Lorena and Michael shared a Thanksgiving dinner together (something neither of them denied, in any case). Rather, he was offering them to show the manner in which Lorena and Michael presented themselves as a couple. The trial court agreed, accepting the Facebook posts into evidence. It stated that it

would consider the Facebook posts not for the truth of the matters asserted but, rather, for the way that Lorena and Michael presented themselves. (Initially, the court admitted all of the posts. It noted that, as to posts by third-party friends, Lorena and Michael had the power to remove them from their respective profiles. Later, it narrowed its review, specifying in its written order that it had considered only those posts submitted by Lorena or Michael.)

¶ 25   Jeffrey testified primarily regarding finances. He submitted a series of letters from his accountant and from which the 2008 to 2012 true-up amounts had been calculated. These letters became exhibit No. 7. Lorena objected to the admission of exhibit No. 7, arguing that the documents were hearsay. The trial court overruled the objection. Aside from finances, Jeffrey stated that, following the 2007 divorce, Lorena told him that he was fortunate because he could remarry without losing maintenance.

¶ 26   The trial court ruled in favor of Jeffrey, terminating Lorena's maintenance. The court went through the six factors, noting facts that fit into each category but not necessarily commenting on the gravity of those facts. It found that Lorena and Michael enjoyed a lengthy relationship. Lorena and Michael began dating in 2006 and became exclusive soon thereafter. Lorena had not dated anyone else since. The amount of time they spent together was significant, with the two spending most weekends together. As to the nature of their activities, the court noted that the two golfed, dined, and traveled together (where they shared a bed). They attended special events together, such as birthday parties and graduations. (The court incorrectly stated that Lorena attended the birth of Michael's grandchild.) Though Lorena and Michael did not commingle finances, they did share a golf club membership and Michael saved money on gas by staying at Lorena's on Fridays. They spent at least two Thanksgivings and two Christmases together. The court believed that Lorena minimized the amount of holiday time they spent

together. The court noted that, in 2012, on Facebook, Lorena had posted a "family Christmas picture" (*i.e.*, the photo that had been taken on Thanksgiving). The court found that Lorena and Michael presented themselves as a couple in their social circles and on Facebook, listing their status as "in a relationship."

¶ 27 The court "place[d] considerable weight" on its credibility determinations. It did not find Lorena to be credible, and it listed several inconsistencies in her testimony. These included: (1) failing to candidly confirm that Michael's car was depicted in a photograph taken outside her home; (2) changing her Facebook status in 2012 to state "in a relationship," even though she testified that she was not intimate with Michael after 2011; (3) stating that Michael rarely worked from her home on Fridays, though both Michael and Valerie testified otherwise; (4) initially stating that she did not take vacations (as she counted many of her golf outings as volunteer trips); and (5) stating that she rarely went to see Michael's band play, though she posted pictures of the (Elgin) band on Facebook.

¶ 28 The trial court deemed the *de facto* marriage to have existed as of January 30, 2012. In a subsequent order, it required Lorena to repay Jeffrey approximately $70,000 in maintenance payments. The court denied Lorena's motion to reconsider, and Lorena appeals.

¶ 29                                    II. ANALYSIS

¶ 30 On appeal, Lorena argues that the trial court erred in: (1) admitting and considering the Facebook evidence; (2) finding the existence of a *de facto* marriage so as to necessitate the termination of maintenance; and (3) admitting exhibit No. 7 over her hearsay objection. For the reasons that follow, although we reject Lorena's evidentiary arguments, we find the trial court's finding of a *de facto* marriage to be against the manifest weight of the evidence.

¶ 31                                    A. Facebook

¶ 32    Lorena asserts that the trial court erred in admitting the Facebook evidence, because it constituted inadmissible hearsay, lacked foundation, and was not probative of whether Lorena and Michael cohabited.  We review the trial court's evidentiary ruling for an abuse of discretion. *People v. Land*, 241 Ill. App. 3d 1066, 1079 (1993).

¶ 33    Hearsay is defined in evidence as "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801 (eff. Jan. 1, 2011); see *People v. Sorrels*, 389 Ill. App. 3d 547, 553 (2009). Unless an exception applies, hearsay is inadmissible. *Sorrels*, 389 Ill. App. 3d at 553.  Not every out-of-court statement is hearsay.  For example, "when the mere making of the statement is the significant fact, hearsay is not involved."  Michael H. Graham, Graham's Handbook of Illinois Evidence § 801.5, at 763 (10th ed. 2010); see *People v. Kliner*, 185 Ill. 2d 81, 150-51 (1998) (the mere fact that a conversation took place was significant, and it was not hearsay to testify that it happened).  This is because the statement is not being offered for the truth of the matter asserted. *Kliner*, 185 Ill. 2d at 150.

¶ 34    Here, Jeffrey explained that he did not offer the Facebook posts to show the truth of the matters asserted.  Rather, he offered the posts to show the manner in which Lorena and Michael presented themselves as a couple.  The trial court agreed and admitted the statements.   The court specified that it did not consider posts by third parties, but considered only those posts by Lorena and Michael.  The manner in which Lorena and Michael presented themselves was a strong indicator of the nature of their relationship, though it was only one factor for the court to consider.  We take the court at its word that it did not consider the posts for the truth of the matters asserted.  And, for the majority of the posts, there is little risk that it did.  Obviously, the court did not consider the truth of whether Lorena and Michael *really* played golf on a given day

or ordered hotdogs with two onions and no peppers. Rather, the court was free to consider the fact in itself that Lorena and Michael were open with others about their activities and status as a couple. Sharing publicly, as opposed to keeping private, the status of one's relationship is relevant in that it suggests *some* level of commitment, the degree of which is determined by the evidence in full. Because the posts were offered and considered only to show the manner in which Lorena and Michael presented their relationship to others, and not for the truth of the matters asserted in the post, they were not hearsay.

¶ 35 With one minor exception to be discussed below (*infra* ¶ 42), the few posts that presented a risk that they would be considered for the truth of the matters asserted, such as the "in a relationship" status post, were properly used for impeachment purposes. Of course, a statement used for impeachment purposes requires a foundation. Lorena argues that Jeffrey did not lay a proper foundation. A party must lay a proper foundation before a document may be entered into evidence. *Piser v. State Farm Mutual Automobile Insurance Co.*, 405 Ill. App. 3d 341, 348 (2010). Authentication of a document may be made by direct or circumstantial evidence. *Id*. at 349. This is routinely done through the testimony of a witness who has sufficient personal knowledge to satisfy the trial court that the item is, in fact, what its proponent claims it to be. *Id*. Similarly, the admission of an out-of-court statement to show inconsistency with trial testimony requires an adequate foundation. See, *e.g.*, *People v. Hallbeck*, 227 Ill. App. 3d 59, 62 (1992) (foundation required whether a prior inconsistent statement is admitted for substance or for impeachment). A proper foundation includes directing the witness toward the time, place, circumstances, and substance of the statement. *Id*. The witness then must have the opportunity to explain the inconsistency. *Id*.

¶ 36 Here, Lorena complains that Jeffrey provided no foundation for the statements made by

third-party posters. Lorena points to comments in the vein of "glad to see [the two of] you," "looking forward to seeing you," and "hope the baby is doing fine." At trial, the court initially stated that, if Lorena and Michael did not think the third-party comments were a fair representation of their relationship, they would have removed them from their profiles. Clearly, there is no basis for this assumption. Neither Lorena nor Michael testified that they had ever removed any posts, let alone such innocuous comments, from their profiles. No Illinois case discusses the foundational requirements for third-party Facebook posts. While we expect this discussion to occur in the future, we need not address it here. This is because, here, the court clarified in its written order that it did not consider the third-party posts. Thus, we leave for another day the question of foundational requirements for the admission of third-party Facebook posts.

¶ 37    As for Lorena's and Michael's posts used for impeachment, again with one minor exception, (*infra* ¶ 42), we hold that there was adequate foundation. The posts that Jeffrey aimed to use for impeachment were the status posts. Jeffrey asked both Lorena and Michael about the timing of the status posts. Lorena verified that the posts came from her Facebook profile, but she said that she did not remember submitting them. Lorena was given the opportunity to explain the post's origins and any inconsistencies with her testimony. That she was unable to do so convincingly did not cripple the foundation or render the posts inadmissible.

¶ 38    As to the probative value of the Facebook posts, we must consider whether the trial court abused its discretion in determining that any probative value of the posts was not substantially outweighed by the danger of unfair prejudice. *Powell v. Dean Foods Co*., 2013 IL App (1st) 082513-B, ¶ 90; see Ill. R. Evid. 403 (eff. Jan. 1, 2011). We tend to agree with Lorena that the probative value of these posts is minimal. However, we also see no potential prejudice. The

record is otherwise replete with evidence that Lorena and Michael held themselves out to be "in a relationship" and presented themselves as a couple publicly. It is not remarkable that they likewise held themselves out on Facebook as a couple. And, as we have described above, the posts are relatively bland. The posts simply show that Lorena and Michael shared information about joint trips and life moments. There are no posts hinting at engagement, sex, lifelong commitment, *et cetera*. The posts are largely cumulative of, and less remarkable than, the testimony. We do not see prejudice, and we find no error.

¶ 39                                    B. *De Facto* Marriage

¶ 40    Lorena argues that the trial court erred in granting Jeffrey's section 510(c) petition. 750 ILCS 5/510(c) (West 2012). Section 510(c) provides that "the obligation to pay future maintenance is terminated *** if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." *Id*. The purpose of section 510(c) is not to control public morals. *In re Marriage of Sappington*, 106 Ill. 2d 456, 467 (1985). Rather, "[t]he rationale behind termination of maintenance when resident, continuing, conjugal cohabitation exists is [to prevent] the inequity created when the ex-spouse receiving maintenance becomes involved in a husband-and-wife relationship but does not legally formalize it, with the result that he or she can continue to receive maintenance." *In re Marriage of Herrin*, 262 Ill. App. 3d 573, 577 (1994). " 'Where the relationship has achieved a permanence sufficient for the trial court to conclude that it has become a substitute for marriage, equitable principles warrant a conclusion that the spouse has abandoned his or her rights to support from the prior marriage ***.' " *In re Marriage of Weisbruch*, 304 Ill. App. 3d 99, 105 (1999) (quoting *In re Marriage of Herzog*, 761 S.W.2d 267, 268 (Mo. Ct. App. 1988)). "[A] receiving spouse who is *de facto* remarried should be treated no differently from a receiving spouse who is *de jure* remarried." *In re Marriage of*

*Susan*, 367 Ill. App. 3d 926, 937 (2006). The party seeking the termination of maintenance has the burden of establishing that the receiving spouse is cohabiting with another. *Id.* at 929. In determining whether the petitioner has met his or her burden, a court looks to the totality of the circumstances and considers the following nonexhaustive list of factors: (1) the length of the relationship; (2) the amount of time spent together; (3) the nature of activities engaged in; (4) the interrelation of personal affairs (including finances); (5) whether they vacation together; and (6) whether they spend holidays together. *Id.* Each termination case turns on its own set of facts; just as no two relationships are alike, no two cases are alike. *Id.* at 930. The reviewing court will not upset the trial court's ruling on a petition to terminate maintenance based on the existence of a *de facto* marriage unless that ruling is against the manifest weight of the evidence. *Id.* at 929-30. A decision is against the manifest weight of the evidence if the opposite conclusion is clearly evident or if the decision is unreasonable, arbitrary, or not based on the evidence. *In re Marriage of Nord*, 402 Ill. App. 3d 288, 294 (2010).

¶ 41    Here, the trial court's determination of Lorena's credibility colored its findings, and, so, we begin by considering that determination. As a general rule, we will not disturb a trial court's credibility determinations. *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002). Indeed, overall, we believe that the trial court was justified in finding that Lorena was not wholly credible. The transcripts provide numerous instances of Lorena providing evasive and equivocal answers when the questions demanded straight ones. For example, when Jeffrey presented Lorena with a clear eight-by-ten-inch picture of her home and her driveway with two cars parked side by side, Lorena could not simply agree that the picture showed Michael's car. Instead, she stated that she "would have to have a close up on that other car, just to be able to know for sure if I can 100 percent identify that as [Michael's] car." Answers like this are tedious, and the court reasonably

determined that Lorena was not anxious to be candid with it.

¶ 42     However, we agree with Lorena that the record contradicts some of the trial court's findings of alleged weaknesses in her testimony.  For example, the court inaccurately stated that Lorena was present for the birth of Michael's grandchild.  This is nowhere in the evidence, and we understand why Lorena is troubled that the court wrongly imagined that she was present at what would traditionally be an intimate moment shared only with immediate family.  Additionally, and though a smaller point, the court inaccurately concluded that Lorena lied when she stated that she rarely went to Michael's music events, despite posting pictures of Michael's Elgin band.  Lorena actually testified that she never went to see the *Lisle* band.  Michael testified likewise.  Moreover, although we held that overall Jeffrey laid a proper foundation for the Facebook status posts, Jeffrey did not lay a foundation for the posts concerning the Elgin band, nor did he attempt to impeach Lorena on that precise matter.  Therefore, after the conclusion of the evidence, the court should not have gone back and considered those posts for impeachment.  In sum, while the record supports the court's conclusion that Lorena downplayed certain aspects of the relationship, the court went too far in its assertions of her attendance at certain events and in its criticism of her testimony.

¶ 43     Next, we consider the import of the trial court's credibility determination.  The court stated that it "place[d] considerable weight on the credibility of the witnesses in this cause, and in its observation of Lorena Miller while testifying did not find her credible with respect to the nature of her relationship with Michael ***."  However, it does not follow that, because the court did not believe Lorena, Lorena must lose the case.  Even if the court exercised its discretion to discount Lorena's testimony and draw inferences against her, it still had to consider whether the totality of the evidence established by a preponderance of the evidence Jeffrey's right to a

termination of maintenance.

¶ 44    Again, it was *Jeffrey's* burden to show that Lorena and Michael had a *de facto* marriage. Aside from Lorena's testimony, the evidence, including Michael's summation of the relationship, reflected discrete blocks of time spent together, shared friends, vacations and holidays spent together, and shared golfing costs. Critically, however, the record also reflects an absence of evidence that there was ever any intention to make the relationship permanent, commingling of finances, or a shared household or shared household duties.

¶ 45    At first glance, the evidence supporting the trial court's finding of a *de facto* marriage might appear to withstand scrutiny. Lorena and Michael enjoyed a six-plus-year relationship. They were sexually intimate during at least four of those years. They spent most weekends in Lorena's house, from Thursday night to Sunday, and they believed that, if they spent more than half their time together, Lorena's maintenance could be terminated. They were monogamous and held themselves out as a couple. They shared friends. They shared a golf club membership meant for significant others. They traveled out-of-state together on at least 14 occasions. Lastly, they shared some special events, such as holidays, graduations, birthday parties, and baby showers.

¶ 46    However, a general deference to the trial court cannot allow us to affirm the termination of maintenance where the evidence supports finding only an intimate dating relationship and not a *de facto* marriage. In finding a *de facto* marriage here, the trial court looked to the six common-law factors, noting facts that fell into each category. However, the court did little weighing of the facts, instead noting presence only. For example, as to shared finances, it listed the joint golf club membership without noting that, clearly, this fact meant little when weighed against separate households and separation of all other significant assets and income.

Additionally, as to the amount of time spent together, the court simply recounted each witness's testimony (and, as to Lorena, not wholly accurately) without resolving discrepancies or assigning import. The six factors are not a checklist. Searching the evidence to find facts to assign to each of the six factors does not establish that a relationship rises to the level of a *de facto* marriage where those facts lack depth and seriousness. As will be set forth in further detail below, courts should be mindful that the circumstances of an intimate dating relationship are also likely to involve facts that fit into each of the six factors, such that those facts in their totality must attain a certain gravitas to establish a *de facto* marriage.

¶ 47    Putting into proper perspective the usefulness of the six-factor analysis requires an examination of its origins. The six-factor analysis originated in *Herrin*, 262 Ill. App. 3d at 577. The *Herrin* court correctly began with the premise that, in order to determine whether a *de facto* marriage exists, the trial court must look to the totality of the circumstances. *Id.* The court then listed with approval the factors considered by the trial court *in that case*. *Id.* Courts subsequently cited these six factors, without discussion, as though the factors were sufficient to encapsulate the totality of the circumstances in all cases. See *In re Marriage of Thornton*, 373 Ill. App. 3d 200, 209 (2007); *Susan*, 367 Ill. App. 3d at 929; *In re Marriage of Sunday*, 354 Ill. App. 3d 184, 189 (2004); *In re Marriage of Snow*, 322 Ill. App. 3d 953, 956 (2001). Notably, the supreme court has not adopted the six-factor analysis in any manner, let alone adopted it as sufficient to encapsulate the totality of the circumstances in all cases.

¶ 48    While we agree that the six factors were compelling in *Herrin*, we disagree that the six factors are sufficient to encapsulate the totality of the circumstances in all cases. The six factors focus greatly on the emotional and social components of a relationship as opposed to practical and financial aspects that life partners share. In point of fact, only factor four, the "interrelation

of personal affairs," arguably encompasses the more practical components of a marriage-like relationship. And, even though the six factors focus on the emotional components of a potential *de facto* marriage, we believe that the factors miss a key emotional factor that is likely present in any *de facto* marriage: intended permanence and/or *mutual* commitment to the relationship (as will be discussed further, *infra* ¶ 67). Moreover, even though the *Herrin* court used words that, under a plain reading, tend to trigger a search for emotional or social components, *i.e.*, time spent together, nature of activities, interrelation of personal affairs, vacations and holidays spent together, the *Herrin* case itself turned in large part upon significant practical and economic aspects of the relationship: the ex-wife provided a house with working utilities for her partner, furthered his career by taking out a loan for a work van and computer, and paid his child-support obligations. *Herrin*, 262 Ill. App. 3d at 577-78. A fair reading of *Herrin* leads us to the conclusion that, while helpful in most instances, the six-factor analysis was never intended to be used as *the* test to find a *de facto* marriage.

¶ 49    Indeed, if the six-factor analysis were to be used as *the* test to find a *de facto* marriage, a more careful effort should be made as to its wording. On the one hand, factors three and four are very broad: the "nature" of the activities and the "interrelation of their personal affairs." On the other hand, factors five and six are narrow (vacations and holidays) and *themselves fit into* factors three and four. In other words, factors three and four are but slots in which to place actual facts, either positive *or* negative, whereas factors five and six are actual positive facts, which happened to be among the totality of the circumstances in *Herrin*.

¶ 50    As always, the ultimate question a court seeks to answer when determining whether an ex-spouse receiving maintenance has been cohabiting with a new partner, per statute, on a resident, continuing, and conjugal basis is whether the ex-spouse, per common law and

according to the totality of the circumstances, has entered into a *de facto* marriage. And, again, the six-factor analysis is merely a nonexhaustive list of factors that may be considered in making that determination. The six-factor analysis should not, however, upstage the true purpose of section 510(c) in calling for maintenance to be terminated " 'whenever the spouse receiving the maintenance has entered into a husband-wife relationship with another, whether this be by legal or other means.' " *Sappington*, 106 Ill. 2d at 467 (quoting *In re Support of Halford*, 70 Ill. App. 3d 609, 612 (1979)). That is why, in using the six-factor analysis, a court must weigh the seriousness or magnitude of a given factor and not just note its presence. Courts should look for signs of mutual commitment and permanence. Moreover, courts should not allow the language of the six-factor analysis to trigger a search for only emotional and social components of a relationship. Instead, courts must also look to the totality of the circumstances to determine whether the new relationship functions practically and economically in a marriage-like way and, if not, whether there is a reasonable explanation as to why it does not (such as each partner's having an individual abundance of resources or estate-planning goals).

¶ 51    For the reasons that follow, the circumstances of this case demonstrate that Lorena and Michael did not have a *de facto* marriage. Rather, although many of the six factors were present, Lorena and Michael shared no more than an intimate dating relationship. As clarified by the supreme court in *In re Marriage of Bates*, 212 Ill. 2d 489, 524 (2004), an intimate dating relationship is not a *de facto* marriage and, therefore, is not a ground upon which to terminate maintenance. As supported by the supreme court in *Sappington* and by our own court in *Weisbruch*, a deeper level of commitment, permanence, and partnership is needed to establish a *de facto* marriage. We begin by looking at the description set forth in *Bates* of an intimate dating relationship. We then look to descriptions set forth in *Sappington* and *Weisbruch* of a *de facto*

marriage before we turn to the case at hand.

¶ 52    In *Bates*, the supreme court clarified that "intimate[/]dating" is not a *de facto* marriage. *Bates*, 212 Ill. 2d at 524.  In *Bates*, the former wife and her new partner knew each other for 15 years, and they planned on getting married someday.  *Id*. at 505.  They maintained separate residences (though the former wife rented her residence from her new partner).  The new partner stayed overnight in the former wife's home "on occasion."  *Id*.  They reported engaging in sexual relations on two of those occasions.  A special investigator observed the two hugging and kissing.  He also saw the new partner enter the former wife's home and did not see him leave. *Id*. at 505-06.  The two went on walks together and went to dinner and movies.  The former wife allowed her new partner to drive her luxury automobiles "on occasion."  *Id*. at 524.  However, the two did not commingle funds, and they did not vacation together.  *Id*.  The court affirmed the trial court's decision not to terminate maintenance, stating that the evidence supported a finding that the intimate dating relationship was not akin to a marriage.  *Id*.

¶ 53    In *Bates*, the supreme court did not expressly adopt the six-factor analysis.  However, many of the six factors were present.  The relationship was long (factor one).  They apparently spent a fair amount of time together, as the private investigator saw them about town and saw the new partner enter the residence but not leave (factor two).  The two went on walks, went to movies, dined out together, and spent some nights together (activities that married couples as well as intimate daters share), and they planned on getting married someday but had not yet committed (factor three).  And, although the court stated that the two did not commingle finances, the former wife paid her rent directly to her new partner (factor four).  Hence, a financial alliance existed to some extent, in that all housing monies were kept in a "joint pot." No housing was provided to, nor rent paid to, a third party.  Thus, although many of the factors

were present, the court found the "factors" (in the general sense of the word, not the precise "six factors") to be present to a degree supporting only an intimate dating relationship, not akin to a marriage.

¶ 54    As to what *does* constitute a *de facto* marriage, *Sappington* is a seminal case.   In *Sappington*, after knowing each other for 12 years, the former wife and her new partner moved into a single-family residence.   They lived there together for two years with no plans to cancel the living arrangement.   The former wife and her new partner were certainly companions who had joined forces in maintaining a household, but the new partner's impotence led to a sticking point in the case.   Thus, the court was presented with the question of whether parties could meet the conjugal element of a *de facto* marriage even in the absence of sexual relations.  *Sappington*, 106 Ill. 2d. at 459-61.   The court considered several definitions of the term "conjugal" and, without adopting any one definition verbatim, rejected the notion that "conjugal" necessarily connotes sexual intercourse.  *Id.* at 463 (two justices dissenting).   Instead, it cited with approval the following definitions of "conjugal" and of "conjugal rights," respectively: " '[o]f or belonging to marriage or the married state *** or to married persons; matrimonial; connubial' " and " '[m]atrimonial rights; the right which husband and wife have to each other's society, comfort and affection.' "  *Id*. at 462-63 (quoting Black's Law Dictionary 374 (4th ed. 1978)).   It summarized that, while the presence or absence of sexual conduct may be a factor to consider in determining whether a conjugal relationship exists, it is not a requirement.  *Id*. at 464.   Rather, the court held that it is the "husband-and-wife-like relationship which bears the rational relationship to the need for support."  *Id*. at 467.

¶ 55    After *Sappington*, courts debated the import of its statement that it is the "husband-and-wife-like relationship which bears the rational relationship to the *need* for support."  (Emphasis

added.)  *Id*.  Many courts took this statement to mean that it is proper to consider a former spouse's need for support when considering whether to terminate maintenance based on a *de facto* marriage.  See *In re Marriage of Frasco*, 265 Ill. App. 3d 171, 177 (1994); *In re Marriage of Caradonna*, 197 Ill. App. 3d 155, 160 (1990); *In re Marriage of Reeder*, 145 Ill. App. 3d 1013, 1018 (1986).  This court, in *Weisbruch* and *Susan*, rejected that position.  Particularly, in *Weisbruch*, we took the statement to mean that courts should consider "whether the receiving spouse has formed a new relationship wherein the partners *look* to each other for support, not whether the support provided is in fact adequate to meet the receiving spouse's needs." (Emphasis in original.)  *Weisbruch*, 304 Ill. App. 3d at 106.  In other words, courts should consider whether and to what degree the new couple exercises a partnership approach to the acquisition, use, and preservation of material resources and income.

¶ 56    In *Weisbruch*,[1] the parties divorced in 1980 after 12 years of marriage.  They had two children.  The trial court ordered the former husband to pay $1,250 per month in unallocated child support and maintenance.  By 1990, both children had reached the age of majority, but for the next seven years the former husband continued to pay $1,250 monthly.  *Id*. at 101.  In 1997, the former husband petitioned to terminate maintenance, arguing, *inter alia*, that the former wife was in a *de facto* marriage with a new partner.  *Id*.  The evidence showed that, eight years earlier, in 1989, the former wife and her new partner purchased a home together.  The former wife denied any physical attraction to her new partner.  However, during two different periods totaling 2½ years (when they had one long-term houseguest per period), they shared a bed within a

---

[1] *Weisbruch* is best known for establishing (before same-sex marriage was legalized) that two same-sex partners may be considered *de facto* married for the purpose of terminating maintenance.  *Weisbruch*, 304 Ill. App. 3d at 107.

single-family home. They shared equally all expenses related to the home, including the mortgage. They cosigned loans for one another, co-owned their respective cars, and shared groceries. In pooling resources with her new partner, the former wife had decreased her financial needs. However, she still "needed" $950 in maintenance to satisfy her current lifestyle and obligations. The former wife named her new partner as the primary beneficiary of her will, essentially disinheriting her children, leaving them a nominal specific bequest of $1,000 each. The former wife named her new partner as her power of attorney for health care. Additionally, the two vacationed together and they had discussed retiring together in Arizona. *Id*. at 101-02.

¶ 57   We held that the former wife was in a *de facto* marriage with her new partner, despite the alleged lack of physical attraction (which was extremely hard to prove), despite the fact that her new partner was of the same sex, and despite the fact that her new relationship, although lessening her financial need, had not necessarily left her as financially secure as she would have been had she remained single and continued receiving maintenance payments. *Id*. at 106-08. We reasoned that, even though the new partner did not meet all of the former wife's material needs, the former wife *looked* to her new partner to provide material necessities, just as the new partner looked to her. *Id*. at 106. We noted that the evidence showed a relationship far more than that of roommates and more than could be explained by friendship and convenience, as the former spouse claimed. *Id*. at 108.

¶ 58   In *Susan*, we reiterated our position in *Weisbruch* that a former spouse's need for maintenance is not a proper consideration in deciding whether the former spouse is in a *de facto* marriage with a new partner. *Susan*, 367 Ill. App. 3d at 937.

> "[W]here the asserted ground for termination is not a substantial change but rather a *de facto* marriage [citation], the goal is not to determine whether the relationship leaves the

recipient financially secure but, rather, to determine whether the relationship leaves the recipient effectively married. Indeed, in those cases examining whether there is a substantial change in circumstances, the most important question obviously is whether the change in circumstances has materially affected the recipient spouse's need for support. But in cases involving *de facto* marriage, maintenance is terminated because the recipient spouse is involved in a husband-and-wife-like relationship." *Id*. at 931 (citing *Sappington*, 106 Ill. 2d at 467).

In addition, we continued to endorse the consideration of whether the parties commingled finances as a married couple would do. *Id*. (factor four of the six common-law factors).

¶ 59    In *Susan*, the couple kept separate finances and maintained two residences, but the evidence supported finding a *de facto* marriage. The couple had spent nearly every night together over the past three years (although they reported that they had not had sexual intercourse in two years). *Id*. at 928-29. There was no evidence that they ever spent an evening apart. They had virtually unlimited access to one another's homes (the new partner had a key to the former wife's home and the new partner was "always" home to let the former wife into his home), prepared meals together, spent (all) holidays together, cosigned Christmas cards, and vacationed together. *Id*. The trial court found that the total circumstances weighed in favor of finding that the new couple was cohabiting on a resident, continuing, and conjugal basis. *Id*.

¶ 60    We agree with the main holding in *Susan*, *i.e.*, that a court should not consider the receiving spouse's financial need in determining whether she has entered into a *de facto* marriage, but, with regret, we must depart from *Susan*'s subtler points. That is, we must distance ourselves from *Susan* to the extent that it embraces the six-factor analysis as *the* preeminent test to determine a *de facto* marriage. As we have discussed (*supra* ¶¶ 45-47), the six-factor analysis

is but a helpful tool, and a look at its history shows that its originators never intended for it to be *the* test for a *de facto* marriage. The six-factor analysis is insufficient to distinguish an intimate dating relationship from a *de facto* marriage if left unaccompanied by an understanding that the facts falling into each category must achieve a gravitas akin to marital behavior.

¶ 61    In distinguishing an intimate dating relationship, as discussed in *Bates*, from a marriage-like relationship, as discussed in *Sappington* and *Weisbruch*, we think it fair to state the following. Intimate dating relationships have companionship and exclusive intimacy, whereas marriage-like relationships, while likewise having companionship and exclusive intimacy (not necessarily sexual but such that the former spouse does not engage in a similar relationship with a third person), also have a deeper level of commitment, intended permanence, and, unless reasonably explained, financial or material partnership (which would most commonly come in the form of a shared household). For example, as to permanence, in *Sappington*, the court noted that "[t]here [was] no evidence in the record of any intention [by the new couple] to terminate their present living arrangement." *Sappington*, 106 Ill. 2d at 460. Also as to permanence, in *Weisbruch*, the new couple planned to be together permanently, as the former wife planned to retire with her new partner, assigned her new partner as her power of attorney for health care, and named her new partner the beneficiary of her will, over her children. *Weisbruch*, 304 Ill. App. 3d at 101-02. As to partnership, each new couple in *Sappington* and *Weisbruch* joined forces to run a single household, comingled funds and goods, and, at a minimum, *looked* to one another for financial and material support.

¶ 62    Returning to the instant case, the evidence clearly shows companionship and exclusive intimacy. However, a deeper level of commitment, permanence, and financial or material partnership are absent from Lorena and Michael's relationship such that it cannot reasonably be

elevated beyond an intimate dating relationship. It is not a *de facto* marriage. As to commitment and permanence, Lorena and Michael discussed marriage early in the relationship, and Lorena told Michael that it was not the sort of relationship that she was looking for. Granted, Lorena and Michael enjoyed a lengthy dating relationship (though still shorter than the 15-year friendship in *Bates*), but there is no evidence supporting a conclusion that there was *ever* an intention to make the arrangement permanent. Unlike in *Susan*, the parties did not spend nearly every night together or have virtually free access to one another's homes. Lorena and Michael posted publicly on Facebook that they were "in a relationship," they represented themselves as a couple to their friends, they hosted at least one Thanksgiving holiday, and they willingly shared a golf club membership rate under the club-imposed label "significant others." It would be unreasonable to rely upon the golf club label of "significant others" to establish a marriage-like relationship, because "significant others" was the only label under which they could receive the financially advantageous joint rate that they sought. In any case, these signs of commitment are of a level shared by couples in intimate dating relationships. While such signs of commitment are not inconsistent with a marriage-like relationship, they are insufficient, without more, to establish one.

¶ 63    As to partnership, Lorena and Michael never commingled any significant finances or resources. Each paid for his or her own expenses when traveling or dining out. No evidence supported the idea that, should one party fall upon hard financial times, the other would step in to keep their respective lifestyles relatively even. Michael never made any sort of financial commitment to Lorena, nor did she to him. To the contrary, as their relationship cooled and Michael lost his job, he simply canceled his portion of the golf club membership. Lorena did not help him continue the membership or pick up the slack in any of his expenses. And, on the flip-

side, the record does not show that Michael ever offered to take care of Lorena should they move forward in their relationship, even though Michael had the funds to travel the country, dine out, and maintain his own residence. Even though Lorena and Michael saved money by sharing a golf club membership, neither supplemented the other. They equally took advantage of a joint rate. Again, this minimal level of partnership toward the maintenance and acquisition of resources does not support finding a *de facto* marriage. Daters and friends—even business partners—pool resources toward recreational acquisitions all the time. A golf club membership shared by two people who like to golf, which membership, apparently, can be terminated on relatively short notice as Michael later did, does not show a financial partnership similar to that of a married couple. Lastly, the money that Michael saved on gas by working from Lorena's home on Fridays demonstrates *no* financial partnership. Michael would have saved money working from his own home as well. In any event, in the context of this case, it is simply unreasonable to place any significance on saving one day's worth of gas money.

¶ 64    We acknowledge that a couple can cohabit even where each member of the couple maintains a separate household. See, *e.g.*, *Susan*, 367 Ill. App. 3d at 927-28; *Herrin*, 262 Ill. App. 3d at 577-78. However, where the cohabitation must be "resident," these cases are the exception, and, in general, the absence of a shared residence and of shared housing resources, or, at least, of a shared day-to-day existence, is a significant hurdle for a petitioner to overcome. In *Susan* and *Herrin*, despite separate residences, the new couple spent nearly every day together, *not*, as here, just three days per week 70% of the time (for a yearly average of two out of seven days). *Susan*, 367 Ill. App. 3d at 930 (the couple spent nearly every night together despite maintaining separate residences); *Herrin*, 262 Ill. App. 3d at 577-78 (the new partner stayed at the former wife's residence until bedtime, when he returned to his own residence).

¶ 65    We also acknowledge that a court may consider a party's awareness of the legal consequences of cohabitation. Here, Jeffrey stressed to both the trial court and to this court that Lorena and Michael were aware that getting married or spending a significant amount of time together could lead to the termination of Lorena's maintenance. Still, the parties' awareness of the law must be placed in the proper context. For example, in *Herrin*, the new couple was aware that, if they spent every night together, maintenance could be terminated. Therefore, each night, the new partner returned to a separate residence. The new partner's separate residence was a farce in that it did not have gas, heat, or water. As such, the new couple in *Herrin* altered their behavior in order to hide the true nature of their relationship and continue receiving maintenance. *Id.*

¶ 66    Thus, *Herrin*'s reference to an awareness of the law and altered behavior was made in the context of describing parties who *already were* in a married state and who altered their behavior so as to hide the true nature of their relationship from potential witnesses and the court. The reference did not involve parties who altered their behavior so as *not to enter into* a marriage-like relationship in the first place, whether their decision to remain comparatively unattached was motivated by an awareness of the law concerning cohabitation, a lifestyle preference, or some combination of those and other factors. Although Lorena and Michael might have been *aware* that getting married or spending a significant amount of time together could lead to the termination of Lorena's maintenance, there is no evidence to suggest that they altered their behavior to hide the true nature of their relationship and preserve maintenance. It is not surprising that two divorcees who were represented by counsel would be aware of a relatively common principle in divorce law. It would be more surprising if they were not. Establishing a person's awareness of the law is not the same as establishing that the person altered his or her

behavior accordingly. Jeffrey, who bore the burden of proof, elicited very little information concerning Michael's Wadsworth residence and Michael's interest in preserving that residence. Rather than be quick to assume that a couple is "altering their behavior" so as to hide the true nature of their relationship and avoid the termination of maintenance, the court should consider the facts at hand.

¶ 67    Among those facts, we note that Lorena told Michael when they first began dating that she was not looking to get married. Nothing in the record contradicts Michael's testimony on this point. And again, although Michael raised the topic of marriage very early in the relationship, he never proposed. Nothing in the evidence suggests that the conversation was anything more than an attempt to gain a common understanding as to the nature and extent of the relationship moving forward. Nothing in the record suggests that the two ever considered their relationship as anything more than dating. And again, nothing in the evidence suggests that, as time passed, Michael ever offered to make a commitment to Lorena. This case is not just about whether Lorena sought or avoided a marriage-like relationship with a new prospective partner, but also whether that prospective partner, with his own preexisting practical and family obligations, was looking for, and committed to, the same. Just as the termination of maintenance is permanent and irrevocable, a new relationship prompting the termination of maintenance must evince a permanence based on mutual commitment, as manifested by, for example, a combination of the length of the relationship, an intertwining of significant assets that would be difficult to undo, and/or verbal testimony of commitment (which would likely be the most difficult to prove). See, *e.g.*, *Weisbruch*, 304 Ill. App. 3d at 105 (where the relationship has achieved a *permanence* sufficient for the trial court to conclude that it has become a *de facto* marriage, equitable principles warrant the termination of maintenance).

¶ 68    While a *consideration* of the nonexhaustive list of six common-law factors is helpful to any termination analysis, courts should not take a checklist approach wherein they merely note the presence of certain facts that fit into each category.  Courts should be aware that many of the six factors can be present in an intimate dating relationship as well as a *de facto* marriage.  As such, courts should consider the totality of the circumstances and look for a deeper level of commitment, intended permanence, and, unless otherwise explained, financial or material partnership in order to determine that the former spouse and her new partner are involved in a *de facto* marriage.

¶ 69    Our holding is consistent with the purpose of section 510(c) to prevent "the inequity created when the ex-spouse receiving maintenance becomes involved in a husband-and-wife relationship but does not legally formalize it, with the result that he or she can continue to receive maintenance."  *Herrin*, 262 Ill. App. 3d at 577.  Here, Lorena and Michael's lives were so neatly separate that, should either wish to end the relationship, all they would need to do is cancel the golf club membership and walk away.  Lorena and Michael were not living as a husband and wife would live.  They were not residing with one another, they maintained separate households, neither had keys to the other's house or car, neither kept goods at the other's home or did household chores (beyond occasional doggy duty), each paid for his or her own travel and entertainment, they kept separate finances, neither named the other as a beneficiary on any financial document or insurance policy, there is no evidence to suggest that they looked to one another for financial support, and there is no evidence to suggest that they intended to live life as partners.  As such, the totality of the evidence established that Lorena and Michael shared an intimate dating relationship, not akin to a marriage.  Therefore, we reverse the trial court's termination of maintenance.

¶ 70                                    C. Exhibit No. 7

¶ 71    Lastly, Lorena argues that Jeffrey's exhibit No. 7, consisting of five letters written by Jeffrey's accountant, which had been used between 2008 and 2012 to true-up his maintenance obligations, constituted inadmissible hearsay.  After accounting for two sentences of background information, virtually quoted in the previous sentence of this opinion, Lorena's *entire* argument reads as follows: "Under the rules of evidence cited in the previous argument, the hearsay nature and inadmissibility of these documents is beyond question."  Lorena provides no explanation of why the "hearsay nature" of the letters is "beyond question" or why the documents matter to the issues in this case.  Lorena elaborates slightly more in her reply brief, alleging that no exception to the hearsay rule could apply where Jeffrey never established that the letters were prepared in the regular course of business.

¶ 72    This argument is forfeited pursuant to Illinois Supreme Court Rule 341(h)(7) (eff. Feb. 6, 2013).  See also *Velocity Investments, LLC v. Alston*, 397 Ill. App. 3d 296, 297 (2010) (reviewing court is not a repository into which an appellant may dump the burden of argument and research, and the failure to clearly define issues and support them with authority results in forfeiture of the argument).  Even if we were to take Jeffrey's discussion of the issue, and Lorena's response thereto in her reply brief, to mean that she has not forfeited the issue (Ill. S. Ct. R. 341(j) (eff. Feb. 6, 2013) (reply brief "confined strictly" to responding to the arguments presented in the appellee's brief)), we fail to see any prejudice to Lorena.  To whatever extent the documents speak to Jeffrey's rising income, they would be cumulative of the gross amounts listed on his tax documents.  A petition to modify is retroactive only to the date the opposing party received notice of the petition (see, *e.g.*, *In re Marriage of Frazier*, 205 Ill. App. 3d 621, 624 (1990) (concerning support payments)), here February 2013 for Jeffrey's petition to decrease

and December 2013 for Lorena's petition to increase. The documents here concern 2008 to 2012 and therefore predate the issue. However, should the parties pursue their petitions to modify on remand, and should Lorena have further complaints about the documents, she may raise them before the trial court. We will not order a ruling on the petitions to modify, as the parties' circumstances might have changed since the trial court's February 2014 ruling.

¶ 73                                    III. CONCLUSION

¶ 74     For the aforementioned reasons, we reverse the trial court's termination of maintenance, order the return to Lorena of the $70,000 reimbursement, and reinstate the most recent maintenance award retroactive to the date of the trial court's order. Because our holding effectively restores the parties' alternative petitions to modify maintenance, we remand the cause for the parties to pursue them if they wish.

¶ 75     Reversed and remanded.