NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 200657-U

NO. 4-20-0657

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 12, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from |
| RACHELLE HUBBLE, | ) | Circuit Court of |
|     Petitioner-Appellant and | ) | Champaign County |
|     Cross-Appellee, | ) | No. 16D589 |
|     and | ) | |
| TODD HUBBLE, | ) | Honorable |
|     Respondent-Appellee and | ) | Randall B. Rosenbaum, |
|     Cross-Appellant. | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The appellate court affirmed, concluding the trial court did not err by
(1) determining petitioner was in a *de facto* marriage relationship, (2) finding
respondent dissipated marital assets, and (3) awarding petitioner 60% of the
marital property.

¶ 2     In December 2016, petitioner, Rachelle Hubble, filed a petition for dissolution of
marriage to respondent, Todd Hubble.  In November 2020, the trial court entered a written order
(1) determining respondent dissipated marital assets by incurring medical debt in the amount of
$113,706, (2) awarding petitioner 60% of the marital property and respondent 40% of the marital
property, and (3) finding petitioner had a *de facto* marriage with her paramour and denying
maintenance.

¶ 3     Petitioner appeals, arguing the trial court erred by finding she had a *de facto*
marriage with her paramour.  Respondent cross-appeals, arguing the court erred by (1) finding

respondent dissipated marital assets by incurring $113,706 in medical debt and (2) awarding petitioner 60% of the marital property. For the following reasons, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5        In December 2016, petitioner filed a petition for dissolution of marriage. The petition alleged the parties married on July 16, 1994, and had four children: J.H. (born October 6, 1999), twins C.H. and C.H. (born October 25, 2002), and E.H. (born July 1, 2005). On February 19, 2019, the trial court entered an order providing that discovery "shall be completed by" August 16, 2019. The February 19, 2019, pretrial order also provided that dissipation claims "shall be disclosed by" August 16, 2019. On September 19, 2019, petitioner filed a dissipation claim alleging wasteful dissipation of marital assets.

¶ 6                                    A. Trial

¶ 7        The trial began on October 21, 2019, with three days of testimony. The trial continued in October 2020, with two days of testimony. We summarize only the evidence necessary for the resolution of this appeal.

¶ 8                                    1. *Petitioner*

¶ 9        During the October 2019 trial, petitioner testified she worked for Carle Hospital as a physician liaison and earned $86,000 per year. She earned approximately $79,000 in 2018, $65,000 in 2017, and $61,000 in 2016. She previously worked in real estate, in pharmaceuticals, and as a substitute teacher. Petitioner worked, at least part-time, for a large portion of the marriage. Respondent traveled for work and petitioner was home with the children every night. During the October 2020 trial, petitioner testified that August 19, 2020, was her last day working for Carle. According to petitioner, she received $2676 per month in unemployment income and

respondent's gross monthly income was $29,166.66. Petitioner recently interviewed for two positions.

¶ 10    Prior to the separation, petitioner testified the parties "lived in a very nice, two-story house with six bedrooms and four fireplaces, a sunroom, workout room, [and an] additional den/office. We had a shed with all the boats and all of the toys and equipment on six acres." Petitioner now lived in a house approximately half the size but in a nice subdivision near respondent. According to petitioner, her shopping habits changed following the separation and she no longer enjoyed the same standard of living. The parties previously took multiple vacations each year. Petitioner testified she felt dependent on maintenance to support her lifestyle and her children.

¶ 11    There was a court order for respondent to pay petitioner $5000 per month for unallocated support. From June 2018 to October or November 2018, respondent reduced his unallocated support payments to $1600 twice per month. According to petitioner, respondent's bonuses were not included in calculating the $5000 unallocated support payment. Petitioner testified she wanted respondent's bonuses included in his income for purposes of calculating spousal support and child support, but she agreed to "stick with one number even though it very likely would rise every year."

¶ 12    Petitioner testified she and George Kasbergen had been in a relationship for two and a half years. Petitioner testified she and Kasbergen never lived together and broke up three or four times. Petitioner denied that Kasbergen lived in the rental house with her and testified he stayed the night "[m]aybe five times in the last year." Petitioner testified that her recent overnight stays with Kasbergen were very different from early in the relationship. On nights they spent together, petitioner testified Kasbergen left early in the morning. Petitioner identified

a document as being Kasbergen's journal that "reflects at the beginning of our relationship." When asked if she spent substantial time with Kasbergen, petitioner stated, "I don't know. Okay. So it varies. So I might not see him one day. The next day I might see him for two minutes. The next day I might see him for 15 minutes. The next day I might see him for two to four hours if we have a meal together. So it varies greatly."

¶ 13　　　According to petitioner, Kasbergen gave her a diamond necklace and diamond earrings as gifts. Kasbergen also bought petitioner a winter coat for approximately $500 and a Lululemon jacket. Petitioner testified she typically spent the Fourth of July with Kasbergen and they spent one Thanksgiving together. Petitioner and Kasbergen exchanged Christmas gifts but did not celebrate the holiday together with their families. In December 2016, Kasbergen gave her a $2500 Amazon gift card to help petitioner buy gifts for her children.

¶ 14　　　Petitioner testified she made medical appointments for Kasbergen for two to three years because she was a nurse. Kasbergen's oldest son was recently in the hospital and petitioner assisted Kasbergen with medical care for him. On September 30, 2019, petitioner provided Kasbergen with a list of questions to ask about his son's medical treatment. According to petitioner, attending church with Kasbergen was "like a date."

¶ 15　　　Petitioner testified she went to Aruba in 2017 with her children, Kasbergen, and his children. Kasbergen paid for a portion of the 2017 Aruba trip, but petitioner could not recall exactly what he paid for. In 2019, petitioner again went to Aruba with her children, Kasbergen, and some of his children. Petitioner testified Kasbergen did not pay for any portion of the 2019 Aruba trip. In 2019, Kasbergen paid for petitioner to go to Italy with Kasbergen, his brother, and his sister-in-law. Petitioner, her daughter, Kasbergen, and his daughter took a trip to California in July 2019, and Kasbergen paid for a recreational vehicle for the week. Petitioner testified she

and Kasbergen took multiple trips to Chicago, Iowa, Las Vegas, and Dallas and shared the expenses.

¶ 16            In January 2019, the sale of the marital residence closed and $198,385.54 was deposited in respondent's attorney's trust account. Petitioner testified that, in February 2019, she rented a house at 1612 Briarwood Lane in Mahomet, Illinois. According to petitioner, she had a written two-year lease agreement with GK Family, LLC (GK Family). Petitioner identified canceled checks and rent receipts for rent payments from February to August 2019. One of petitioner's exhibits showed the checks for her security deposit and first month's rent cleared on February 25, 2019. Petitioner chose to lease a house instead of purchasing a home because the equity from the sale of the marital residence was held in escrow at the time. Petitioner intended to purchase the Briarwood Lane house once the divorce was final.

¶ 17            Kasbergen was the manager of GK Family. According to petitioner, she talked with Kasbergen prior to the GK Family's purchase of the Briarwood Lane home and asked for a couch, a rug, a hutch, and outdoor furniture to be negotiated in the purchase price of the house. Petitioner testified she was interested in the Briarwood Lane home because it was close to respondent. According to petitioner, she did not pick out the house, but she discussed it with Kasbergen. Petitioner walked through the house at least twice, and Kasbergen accompanied her once. Petitioner was present when Kasbergen closed on the home. According to petitioner, GK Family put new flooring in and had some areas of the house painted.

¶ 18            During the October 2020 trial, petitioner testified she terminated her lease for the Briarwood Lane property and moved to 1401 North Brookhaven in January or February 2020. According to petitioner, Kasbergen agreed to terminate the lease early and without penalty. GK Family no longer owned the Briarwood Lane property. At the time of the October 2020 trial,

petitioner testified she was no longer in a relationship with Kasbergen. According to petitioner, she and Kasbergen remained friends and saw each other a few times a week.

¶ 19        Petitioner testified respondent suffered a snow mobile accident in December 2016. According to petitioner, there was a balance of $113,076 from the Mayo Clinic. When petitioner was asked about the dissipation claim, respondent's counsel objected and argued the dissipation claim was filed on September 19, 2019, and not before the August 16, 2019, deadline set by the February 19, 2019, pretrial order. The trial court allowed petitioner to present evidence about the dissipation claim and reserved ruling on whether the claim was timely. Petitioner testified she specifically asked respondent if procedures at the Mayo Clinic were out of network and respondent chose the Mayo Clinic even though the providers were out of network. According to petitioner, the procedures were not emergency procedures, they occurred six months after the accident, and she offered to help respondent pick an approved provider. Petitioner testified that the parties had "Health Alliance and surgery could have been covered there."

¶ 20                    2. *George Kasbergen*

¶ 21        Kasbergen testified he was a dairyman and lived in Mansfield, Illinois. According to Kasbergen, he and petitioner began dating in late November or early December 2016. Kasbergen's five children are the owners of GK Family. GK Family was established in 2018 to take in assets gifted by Kasbergen's father following his death. As the manager of GK Family, Kasbergen had sole authority to decide what assets GK Family purchased. Kasbergen testified he spoke with his accountant about GK Family buying a house and renting it as an investment. In 2019, petitioner found a house at 1612 Briarwood for GK Family to purchase. According to Kasbergen's accountant, the investment would provide a 7% return, so Kasbergen

thought it was a good investment. Kasbergen testified the purchase price of the house was approximately $424,000.

¶ 22        Kasbergen identified text messages between himself and petitioner. A November 11, 2018, text message contained a link to the real estate listing for 1612 Briarwood Lane. The next day, petitioner sent Kasbergen a text message that read, "Yes I would for sure do the cooking and cleaning honey if you bought that place[.]" The text messages showed discussions between petitioner and Kasbergen about negotiating the purchase of the house on Briarwood Lane. Kasbergen, as the manager of GK Family, entered into a lease renting the house to petitioner with the understanding that she would purchase the house once she "got the settlement." According to Kasbergen, GK Family put new floors in the Briarwood Lane property at petitioner's request and petitioner did not reimburse GK Family for the floors. Kasbergen received a text from petitioner on February 22, 2019, indicating he could deposit petitioner's security deposit and rent checks. Kasbergen denied cashing petitioner's rent checks and returning the money to her. Kasbergen denied living in the house or spending the night at the house with petitioner. GK Family subsequently sold the home for $415,000.

¶ 23        Kasbergen identified a document he called a "Valentine's Day calendar." Kasbergen testified the document accurately reflected the time he spent with petitioner from November 27, 2016, through October 9, 2019. Kasbergen defined an "overnight" as spending all night with someone and waking up in the morning. When he left petitioner's residence at 3 a.m., Kasbergen did not consider that to be an "overnight." Kasbergen noted in the document when he "napped" at petitioner's house and then went to work at 2:30 or 3 a.m. Kasbergen also noted when he and petitioner had intercourse.

¶ 24 Kasbergen testified his journal noted he and petitioner broke up on December 30, 2018. An entry for January 3, 2019, states, "6am RH to Y—RH to GK Smooch." An entry for January 4, 2019, states, "Pilates Y Look at House 11am." Entries in May 2019 also indicated Kasbergen and petitioner ended their relationship. Kasbergen testified he and petitioner were not dating at the time of the October 2020 trial.

¶ 25 In 2019, Kasbergen paid for plane tickets for a trip to Italy with petitioner. In 2018, Kasbergen paid for a trip to Las Vegas with petitioner. According to Kasbergen, he and petitioner took multiple trips to California, and he paid the travel expenses. Kasbergen and petitioner went to Aruba twice, once in 2017 and once in 2019. In 2017, Kasbergen helped petitioner pay for plane tickets for herself and her children.

¶ 26           3. *Respondent*

¶ 27 Respondent testified petitioner put her career "on the back burner" when she did not work due to there being a lot to do with the children. Once the parties' children got a little older, petitioner began working in real estate. According to respondent, petitioner's earnings helped, but he did not think she had to work.

¶ 28 Respondent testified petitioner paid for the children's health insurance and cellular telephone bills since the separation. Respondent did not recall petitioner asking him to get prior authorization for his medical care at the Mayo Clinic. When asked if he recalled the "bill after [he] went somewhere else that was not prior approved," respondent replied, "Yes." Respondent testified the bill from the Mayo Clinic was approximately $113,000 and he paid the bill off with "monies that [he] had."

¶ 29           B. Closing Argument

- 8 -

¶ 30　　　　Petitioner, appearing *pro se*, requested the trial court award her 65% of the marital property and to assign each party their own debts. Petitioner requested $8000 per month for maintenance and $50,000 for attorney fees. Petitioner further asked that respondent pay for health insurance for the children, the children's cell phone bills, all college expenses, and the children's cars and car insurance. Petitioner did not request child support.

¶ 31　　　　Respondent argued the evidence showed petitioner was in a *de facto* marital relationship with Kasbergen. If the trial court found that petitioner was entitled to maintenance, respondent asked the court to impute $89,000 in annual income when calculating maintenance. Respondent asked for an equal division of the marital assets. As to debts, respondent's counsel argued, "[M]y client had a significant medical bill which he has paid off. She's has [*sic*] significant attorney fee debts. I would just say call those awash [*sic*] in that she, [petitioner], keep her own debts."

¶ 32　　　　　　　　　　　C. Trial Court's Ruling

¶ 33　　　　In November 2020, the trial court entered a lengthy written order on dissolution, division of marital property, attorney fees, college costs, maintenance, and child support. In the order, the court made specific credibility findings that read, in part, as follows:

> "Both [petitioner] and [Kasbergen] minimized the significance of
> their relationship and how dependent they were on each other.
> [Kasbergen] clearly used GK LLC to help her in finding a place to
> live but he stressed he did it for the trust's financial gain; they
> ultimately sold the property for a loss. The financial arrangements
> were suspicious. The first rent check was dated Feb. 1.
> [Petitioner] admitted receiving emails from her counsel on Feb. 19

- 9 -

that she should pay rent, get receipts and that she did not care if [Kasbergen] paid her back (which both [petitioner] and [Kasbergen] denied). It was the next day that [Kasbergen] sent her a text saying that if she could not pay rent, she could ask her mother because it would be 'cleaner.' [Petitioner] wrote individual checks for February through December and gave them all to [Kasbergen] at the same time who then deposited the February check on February 22.

[Petitioner] and [Kasbergen] also minimized certain aspects of their relationship. For instance, [Kasbergen] said that he never had an 'overnight' with her and all of the evenings were 'naps' because he left for work at 2 a[.]m. Finally, the timing of [petitioner's] actions is suspicious. After the trial in October 2019, when her financial arrangement with GK LLC and [Kasbergen] was criticized, she moved out and into another apartment for less money. [Kasbergen]/GK LCC sold the house for a loss and they never recovered their costs of improvements from [petitioner]. At the same time, after she was criticized for potentially cohabitating with [Kasbergen], she ended their relationship."

The court expressed serious concerns about petitioner's credibility on financial issues and her relationship with Kasbergen.

¶ 34    The trial court determined that petitioner made a *prima facie* showing of dissipation as to respondent's $113,706 medical bill from the Mayo Clinic "because this was an

injury that occurred during the marriage and the bill was for [respondent's] sole benefit." The court found that, although respondent claimed petitioner did not ask him to obtain authorization from Carle, he admitted the bill was high because it was without prior authorization from Carle. The court found respondent "failed to prove by clear and convincing evidence that the $113,706 medical bill was a reasonable amount for an appropriate use of marital funds. The court noted a common result of a finding of dissipation was for that party to reimburse the other party for half of the amount dissipated. The court stated it would consider this in determining the division of property by adding $56,853 to respondent's assets.

¶ 35        The trial court made a detailed division of the marital assets and debts and ultimately awarded approximately 60% of the marital assets to petitioner. The court noted the marriage was lengthy and petitioner was the primary caregiver for the children. The court also noted respondent earned income substantially higher than petitioner. Although petitioner was unemployed at the time of the October 2020 trial, she was likely to obtain employment in the near future. The court noted both parties were in reasonably good health, could continue to work for the indefinite future, and respondent had the ability to accrue more income than petitioner. The court determined that awarding petitioner approximately 60% of the marital assets was an equitable division.

¶ 36        The trial court found petitioner cohabitated with Kasbergen on a resident, continuing, conjugal basis beginning in December 2016. Accordingly, the court determined petitioner was not entitled to maintenance. In making this determination, the court noted its earlier credibility findings and stated that petitioner and Kasbergen attempted to minimize their activities and time together. The court found that petitioner and Kasbergen spent holidays together, their children were good friends, and they spent many nights together even if

Kasbergen left for work at 2:30 a.m. The court found they had a sexual relationship. Although they denied wanting to get married or live together, the court found comments were made in their text messages that it would be nice to live together.

¶ 37 The trial court also found petitioner and Kasbergen had intertwined finances. When they traveled together, Kasbergen paid for many of the expenses. The court found that Kasbergen, as the main actor for GK Family, agreed to buy a home to rent to her. Petitioner picked the home and had improvements made that she never reimbursed GK Family for. The court noted the home was sold for a loss and not retained as a rental property after petitioner moved out.

¶ 38 Finally, the trial court found the timing of the relationship to be suspicious. The court noted the relationship began shortly after the parties separated and Kasbergen's "journal shows that the relationship quickly turned sexual and they spent a significant amount of time together." The court found that petitioner and Kasbergen broke up after the October 2019 trial, which "ironically coincided with the significant cross-examination about their relationship which provided [the] [c]ourt with information that they were cohabitating." The court went on to state, "It is clear that [petitioner] did not want the [c]ourt to find that there was cohabitation and they 'broke up.' This is consistent with other actions by [petitioner] such as moving out of the house GK LLC bought for her when the financial transactions were criticized at trial in October 2019." After considering the totality of the circumstances, the court concluded respondent made a sufficient showing that petitioner and Kasbergen were in a *de facto* marriage and petitioner failed to rebut that showing. Accordingly, the court declined to order respondent to pay maintenance.

¶ 39 This appeal followed.

¶ 40 II. ANALYSIS

¶ 41 On appeal, petitioner argues the trial court erred by finding she had a *de facto* marriage with her paramour. Respondent cross-appeals, arguing the court erred by (1) finding respondent dissipated marital assets by incurring $113,706 in medical debt and (2) awarding petitioner 60% of the marital property.

¶ 42                                  A. *De Facto* Marriage

¶ 43 In relevant part, section 510(c) of the Illinois Marriage and Dissolution of Marriage Act (Act) provides that "the obligation to pay future maintenance is terminated *** if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." 750 ILCS 5/510(c) (West 2020). "Maintenance will be terminated based upon resident, continuing, conjugal cohabitation if the ex-spouse paying the maintenance can show that a *de facto* husband-and-wife relationship exists." *In re Marriage of Herrin*, 262 Ill. App. 3d 573, 576, 634 N.E.2d 1168, 1170 (1994). The party seeking to terminate maintenance bears the burden of proving the receiving party is cohabiting with another. *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 40, 40 N.E.3d 206. In determining whether the burden has been met, "a court looks to the totality of the circumstances and considers the following nonexhaustive list of factors: (1) the length of the relationship; (2) the amount of time spent together; (3) the nature of activities engaged in; (4) the interrelation of personal affairs (including finances); (5) whether they vacation together; and (6) whether they spend holidays together." *Id.* A reviewing court will not reverse the trial court's finding of a *de facto* marriage relationship unless that finding is against the manifest weight of the evidence. *Id.* A decision is against the manifest weight of the evidence where the opposite conclusion is clearly evident or if it is unreasonable, arbitrary or not based on the evidence. *Id.* "Each termination case turns on its own set of facts; just as no two relationships are alike, no two cases are alike." *Id.*

- 13 -

¶ 44        We note that petitioner asserts that the question presented to this court is one of statutory construction subject to *de novo* review. In her brief, petitioner argues this court must determine how to define a "resident, continuing conjugal" relationship as set forth in section 510(c) of the Act. However, petitioner goes on to argue that the totality of the relevant facts in this case do not warrant a finding of cohabitation. Additionally, petitioner cites *In re Marriage of Bates*, 212 Ill. 2d 489, 819 N.E.2d 714 (2004), in her reply brief. In *Bates*, the Illinois Supreme Court discussed the standard of review as follows: "The standard of review of a support order is whether it is an abuse of discretion, or whether the factual predicate for the decision is against the manifest weight of the evidence. [Citation.] In other words, if the court's exercise of discretion has an evidentiary basis, then the reviewing court will consider the manifest weight of the evidence." *Id.* at 523-24. Accordingly, we consider whether the trial court's finding that petitioner and Kasbergen were in a *de facto* marriage relationship was against the manifest weight of the evidence.

¶ 45        In this case, the trial court found petitioner cohabitated with Kasbergen on a resident, continuing, conjugal basis beginning in December 2016. In making this determination, the court made credibility findings and noted that petitioner and Kasbergen attempted to minimize the significance of the relationship and how dependent they were on each other. The parties admitted they had a sexual relationship. Petitioner identified Kasbergen's journal and stated it reflected the beginning of the relationship. The journal indicated petitioner and Kasbergen spent a significant amount of time together. Although Kasbergen testified he did not consider his "naps" at petitioner's house to be "overnights," Kasbergen testified that he frequently slept at petitioner's house and then left at 2:30 or 3 a.m. to go to work.

¶ 46        As to the nature of the activities petitioner and Kasbergen engaged in and the interrelation of personal affairs, petitioner testified Kasbergen gave her gifts, including clothing and jewelry. Petitioner also testified she made medical appointments for Kasbergen for two to three years. Petitioner assisted Kasbergen with medical care for his son who had recently been hospitalized. In December 2016, Kasbergen gave petitioner a $2500 gift certificate to help buy gifts for her children.

¶ 47        The evidence further showed petitioner and Kasbergen had intertwined finances. When petitioner and Kasbergen traveled together, Kasbergen testified he paid for many of the expenses. Although petitioner had a two-year lease to rent the Briarwood Lane home from GK Family, her level of involvement in purchasing the home was indicative of a *de facto* marriage. Petitioner became interested in the house, expressed her approval of Kasbergen purchasing the home (offering to cook and clean), toured the home, involved herself in suggesting what items might come with the house, attended the closing, and had improvements made for which she never reimbursed GK Family. Petitioner asserts the improvements made support her argument that her relationship with Kasbergen was merely a landlord-tenant relationship. However, Kasbergen testified he bought the house as an investment. Rather than retain the house as a rental property when petitioner moved out, he instead sold the home for a loss. Petitioner also asked to break the lease early, which Kasbergen agreed to allow her to do without penalty. The trial court found the timing of these actions suspicious because they coincided with the October 2019 trial, which emphasized the evidence of cohabitation regarding the purchase of the house. The court also noted that, although they denied wanting to get married or live together, comments were made in their text messages that it would be nice to live together.

¶ 48    Petitioner and Kasbergen both testified that they took numerous vacations together, including at least two trips to Aruba and one to California with some of their children. Petitioner and Kasbergen also took trips to Chicago, Iowa, Las Vegas, and Dallas. As for holidays, petitioner testified she usually spent Fourth of July with Kasbergen and she spent one Thanksgiving with Kasbergen. Petitioner testified they bought each other Christmas gifts but did not spend the holiday together.

¶ 49    Petitioner argues this court should follow the rationale of *Miller*, where the Second District concluded that the six factors originally laid out in *Herrin* were insufficient to encapsulate the totality of the circumstances in every case. *Miller*, 2015 IL App (2d) 140530, ¶ 48. The *Miller* court stated, "[A] court must weigh the seriousness or magnitude of a given factor and not just note its presence. Courts should look for signs of mutual commitment and permanence." *Id.* ¶ 50. The court distinguished an intimate dating relationship from a marriage-like relationship as follows:

> "Intimate dating relationships have companionship and exclusive
> intimacy, whereas marriage-like relationships, while likewise
> having companionship and exclusive intimacy (not necessarily
> sexual but such that the former spouse does not engage in a similar
> relationship with a third person), also have a deeper level of
> commitment, intended permanence, and, unless reasonably
> explained, financial or material partnership (which would most
> commonly come in the form of a shared household)." *Id.* ¶ 61.

¶ 50    Petitioner argues there was no evidence that petitioner and Kasbergen intended their relationship to be permanent. Petitioner notes Kasbergen's journal indicated the couple

broke up multiple times during the relevant period. However, the journal entries also show petitioner and Kasbergen continued their relationship within days of "breaking up." Additionally, the trial court noted that their breakup following the October 2019 trial was suspicious and based, at least in part, on the evidence of cohabitation adduced at the trial. The trial court also determined petitioner and Kasbergen "minimized the significance of their relationship and how dependent they were on each other." We acknowledge *Miller*'s emphasis on the practical, financial, and permanent aspects of evaluating whether a *de facto* marriage relationship exists. We find the trial court's order demonstrates its consideration of these aspects in addition to its consideration of the six nonexhaustive factors originally set forth in *Herrin*, 262 Ill. App. 3d at 577.

¶ 51     Our review of the record demonstrates the trial court's finding that petitioner cohabitated with Kasbergen on a resident, continuing, conjugal basis beginning in December 2016 was not against the manifest weight of the evidence. As discussed above, the evidence showed petitioner and Kasbergen spent a significant amount of time together and Kasbergen often stayed at petitioner's house. Petitioner and Kasbergen also interrelated their personal affairs, as evidenced by the fact that petitioner made medical appointments for Kasbergen and assisted him with medical decisions when his son was hospitalized, and that Kasbergen, as manager of GK Family, purchased a house that petitioner wanted and later sold the home at a loss. The trial court thoroughly reviewed the totality of the circumstances and found petitioner cohabitated with Kasbergen on a resident, continuing, conjugal basis. This determination was not against the manifest weight of the evidence.

¶ 52                    B. Dissipation of Marital Property

¶ 53        "Dissipation is the use of marital assets for the benefit of one spouse for purposes unrelated to the marriage while the marriage is undergoing an irreconcilable breakdown." *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 78, 128 N.E.3d 1237. We review a trial court's findings on dissipation under the manifest weight of the evidence standard. *In re Marriage of Seversen*, 228 Ill. App. 3d 820, 824, 593 N.E.2d 747, 749 (1992). "[W]here the facts are disputed, the credibility of the witnesses and the weight to be given their testimony are matters for the trier of fact. [Citation.] The trial court's credibility determination is central to the adjudication where, as in the present case, the husband and wife are the primary witnesses." *Id.*

¶ 54        Respondent argues the trial court erred by finding respondent dissipated marital assets by incurring $113,706 in medical debt. Respondent asserts "[t]he cost of medical care is a legitimate family expense."

¶ 55        Here, the trial court determined that petitioner made a *prima facie* showing of dissipation as to respondent's $113,706 medical bill from the Mayo Clinic "because this was an injury that occurred during the marriage and the bill was for [respondent's] sole benefit." Petitioner testified respondent suffered a snow mobile accident in December 2016. Petitioner testified she specifically asked respondent if procedures at the Mayo Clinic were out of network and respondent chose the Mayo Clinic even though the providers were out of network. According to petitioner, the procedures were not emergency procedures and she offered to help respondent pick an approved provider. Respondent testified he did not recall petitioner asking about prior approval for the surgery at the Mayo Clinic. When asked if he recalled the "bill after [he] went somewhere else that was not prior approved," respondent replied, "Yes." Respondent then testified the bill from the Mayo Clinic was approximately $113,000 and indicated he paid the bill off with "monies that [he] had."

- 18 -

¶ 56         Given petitioner's testimony that respondent refused to obtain prior authorization for his surgery at the Mayo Clinic, we cannot say the trial court's determination that respondent's medical expenses dissipated marital funds was improper. Petitioner's testimony that the surgery was not an emergency procedure, occurred six months after the accident, and could have been covered by the parties' health insurance further supports the court's finding that respondent dissipated marital assets.

¶ 57         Respondent also argues the trial court was precluded from hearing the dissipation claim. Respondent's entire argument on this point is as follows: "750 ILCS 5/503(d)(2) requires dissipation claims to be filed no later than 60-days prior to the Hearing. [Petitioner] filed her claim for dissipation in September of 2020, less that [*sic*] 60 days from the start of the October 2020 Hearing. The trial court was precluded from hearing [petitioner's] claim for dissipation."

¶ 58         Section 503(d)(2)(i) of the Act provides that "a notice of intent to claim dissipation shall be given no later than 60 days before trial or 30 days after discovery closes, whichever is later[.]" 750 ILCS 5/503(d)(2)(i) (West 2018). We note that petitioner actually filed her dissipation claim in September 2019, although this was still less than 60 days prior to the start of the October 2019 trial. Respondent does not address section 503(d)(2)'s alternate provision providing for notice of a dissipation claim 30 days after discovery closes. Respondent does not dispute that discovery continued after the filing of the dissipation claim. Respondent also does not argue he was prejudiced or surprised by the notice of the dissipation claim. Given that discovery was ongoing, we conclude petitioner's dissipation claim was timely.

¶ 59                         C. Division of Marital Property

¶ 60    Respondent argues the trial court erred by awarding petitioner 60% of the marital property. Specifically, respondent asserts the trial court failed to properly consider the factors set forth in section 503(d) of the Act (750 ILCS 5/503(d) (West 2020)).

¶ 61    Each case rests on its own facts, and the touchstone of whether the division of marital property was proper is whether it is equitable in nature. *In re Marriage of Joynt*, 375 Ill. App. 3d 817, 821, 874 N.E.2d 916, 920 (2007). "[D]epending upon the circumstances of the case 'an unequal division of [marital] property may *** be appropriate.' " *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 661, 895 N.E.2d 1025, 1045 (2008) (quoting *In re Marriage of Kristie*, 156 Ill. App. 3d 821, 825, 510 N.E.2d 14, 17 (1987)). Section 503(d) of the Act lists certain factors to consider, including, in relevant part, (1) each party's contribution to the marital property; (2) the dissipation by each party of the marital property; (3) the value of the property assigned to each spouse; (4) the duration of the marriage; (5) the relative economic circumstances of each spouse; (6) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties; (7) custodial provisions for any children; (8) whether the apportionment is in lieu of maintenance; and (9) the reasonable opportunity of each spouse for future acquisition of capital assets and income. 750 ILCS 5/503(d) (West 2020). "Absent an abuse of discretion, this court will not disturb the trial court's distribution of assets." *Joynt*, 375 Ill. App. 3d at 822.

¶ 62    In this case, the trial court made a detailed division of the marital assets and debts and ultimately awarded approximately 60% of the marital assets to petitioner. The court noted the marriage was lengthy and petitioner was the primary caregiver for the children. The court also noted respondent's income was substantially higher than petitioner. Although petitioner was unemployed at the time of the October 2020 trial, she was likely to obtain employment in

the near future. The court noted both parties were in reasonably good health, could continue to work for the indefinite future, and respondent had the ability to accrue more income than petitioner. The court determined that awarding petitioner approximately 60% of the marital assets was an equitable division.

¶ 63 Respondent asserts the trial court correctly noted petitioner was unemployed, but it failed to note that petitioner's conduct played a significant role in the loss of her job. We find this argument unpersuasive. The court considered petitioner's ability to work and that she was likely to obtain employment in the near future. Nothing in the trial court's written order indicated it based its distribution of the marital property on the fact that petitioner was unemployed. To the contrary, a fair reading of the court's ruling indicates it properly considered petitioner's likely future income and respondent's ability to accrue more income than petitioner. The trial court also took into consideration its determinations as to dissipation, maintenance, and child support.

¶ 64 Our review of the trial court's order demonstrates the court properly considered the factors set forth in section 503(d). To the extent that respondent argues the court should have considered petitioner's conduct regarding the sale of the marital residence, section 503(d) requires the court to "divide the marital property without regard to marital misconduct in just proportions considering all relevant factors." 750 ILCS 5/503(d) (West 2020). A party's conduct regarding the sale of the marital residence was not a factor for the court to consider in determining an equitable division of marital property. We conclude the trial court properly weighed the factors in section 503(d) when it determined an award of approximately 60% of the marital property to petitioner was equitable. Thus, we find the court did not abuse its discretion in apportioning the marital property, and we affirm the judgment of the trial court.

## III. CONCLUSION

For the reasons stated, we affirm the judgment of the trial court.

Affirmed.