NOTICE
Decision filed 08/28/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230196-U

NO. 5-23-0196

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| ROGER D. COLBERT JR., | ) | St. Clair County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 18-D-167 |
| | ) | |
| STACEY L. COLBERT, | ) | Honorable |
| | ) | Patrick R. Foley, |
| Respondent-Appellee. | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Justices Cates and McHaney concurred in the judgment.

**ORDER**

¶ 1     *Held*: We reverse and remand the trial court's judgment denying Roger's petition to terminate maintenance, where the court found Stacey did not cohabitate on a resident, continuing, and conjugal basis with Short while receiving maintenance support from Roger, and then ordering Roger to contribute to Stacey's attorney fees, where the court failed to consider and mention the factors set forth in section 504(a) of the Marriage Act.

¶ 2     Petitioner, Roger D. Colbert Jr., appeals the trial court's February 28, 2023, order denying his petition to terminate maintenance, seeking reimbursement of maintenance from respondent, Stacey L. Colbert, and requesting Stacey pay his attorney fees. At issue is whether the court's order was erroneous. We reverse and remand with directions.

1

¶ 3                                    I. Background

¶ 4      We recite only those facts necessary to our understanding of the case and resolution of this appeal. On March 7, 2018, Roger filed a petition for dissolution of marriage against Stacey, alleging that the parties married on April 15, 1995, and shared three children, A.C. (born Oct. 1995), C.C. (born Dec. 1996), and A.C. (born Feb. 1999). Stacey filed a counterpetition for dissolution of marriage, requesting temporary and permanent maintenance and reasonable and necessary attorney fees from Roger, alleging her need for maintenance support and that she had insufficient funds to pay her attorney fees and costs.

¶ 5      On December 6, 2018, the parties entered into an agreed judgment of dissolution of marriage. The trial court ordered Stacey solely responsible for paying her own living expenses.[1] The parties agreed that Roger would pay Stacey permanent maintenance, commencing November 2018, in the amount of $2045 per month. The order stated the following:

> "A Notice/Order of Withholding shall issue. Said maintenance payable hereunder is subject to modification and termination ***. The parties further agree that each party shall provide their 2018 and 2019 W-2's for the purpose of review of the amount of maintenance paid herein. Each party shall provide said documents directly to the other by March 1, 2019[,] and March 1, 2020."

The parties agreed that Stacey was entitled to the 2007 Jeep Wrangler, and Roger would pay $1500 towards Stacey's attorney fees. Following the judgment, the evidence demonstrated that Roger paid maintenance to Stacey directly from 2018 until December 2021.

---

[1]The trial court ordered Roger to pay one-half of the mortgage payment on the marital residence located at 15 Royal Court, Millstadt, Illinois, prior to the sale of the home.

¶ 6    On December 28, 2021, Stacey's attorney filed two documents, including a "Child Support and Maintenance Court Order Worksheet" (worksheet) and an "Income Withholding Order/Notice for Support." Although no evidence existed that Roger was in arrears on his maintenance obligation, Stacey's attorney filed the above-mentioned documents to garnish Roger's wages in the amount of $2045 per month. The worksheet listed Stacey's address as 116 W. Second St., Roxana, Illinois.

¶ 7    On April 18, 2022, Roger filed a petition to terminate maintenance. Roger requested the trial court terminate his maintenance obligation to Stacey, claiming Stacey resided with her boyfriend, Jody Short, on a "continuous and conjugal basis" at Short's home located at 116 W. Second St., Roxana, Illinois (Short's Roxana home). Roger asserted that Stacey and Short cohabitated since "at least November of 2021," thus, pursuant to section 510(a-5)(1) and (c) of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/510(a-5)(1), (c) (West 2020)), "maintenance terminates by operation of law as of the time that cohabitation began, and [Roger] is entitled to reimbursement for all maintenance paid to [Stacey] since November of 2021." Roger requested the court order Stacey to pay his attorney fees for the filing and presentation of this matter, due to her failure to disclose her cohabitation with Short.

¶ 8    On April 28, 2022, Stacey responded, denying that she cohabitated on a continuing and conjugal basis with Short at Short's Roxana home since November 2021. As such, Stacey denied that Roger was entitled to attorney fees and reimbursement of maintenance payments since November 2021.

¶ 9    On November 15, 2022, Stacey filed a petition for contribution to attorney fees, requesting the trial court order Roger to pay her reasonable and necessary attorney fees and costs. In support, Stacey asserted that her annual income totaled $37,500, thus, she had insufficient income to pay

fees and costs associated with the current litigation stemming from Roger's April 18, 2022, petition to terminate maintenance.

¶ 10 On November 16, 2022, Roger filed a position statement or memorandum in support of his petition to terminate maintenance. Roger asserted that Stacey's landlord provided her 30-day written notice in November 2021 to terminate her rental lease, located at 23 E. Adams Street Millstadt, Illinois (Millstadt apartment), due to the landlord's desire to sell the residence. After Roger learned that Stacey's landlord wished to sell the Millstadt apartment "[a]round November of 2021," Roger texted Stacey requesting her new address to mail her monthly maintenance check. "Stacey responded that she wanted her maintenance to be electronically deposited and didn't have a new address." Roger highlighted that Stacey did not seek an income withholding order with the trial court until December 28, 2021—over two years following the dissolution of marriage—which prompted him to hire a private investigator based on his suspicion that Stacey cohabitated on a continuing and conjugal basis with Short.

¶ 11 On November 16, 2022, the trial court held a hearing on Roger's petition to terminate maintenance. The following evidence was adduced at the hearing.

¶ 12 A. William Keaney

¶ 13 Roger called William Keaney, a veteran private investigator, who testified to the following. Roger hired Keaney and Bob Thomure, both private investigators, to conduct surveillance of Stacey from January 2022 through March or April 2022. During his testimony, Keaney testified to an investigative report he prepared during his surveillance of Stacey. The report included 16 instances that Keaney surveilled Stacey, along with his detailed observations.

- On Wednesday, January 5, 2022, at 2 p.m., Keaney observed Stacey leave her place of employment in Caseyville, Illinois. Keaney testified that he then observed Stacey

4

drive to Short's Roxana home. Photo included in report.

- On Monday, January 10, 2022, at 5:47 a.m., Keaney observed Stacey's Jeep Wrangler parked in the driveway of Short's Roxana home. Photo included in report.

- On Friday, January 14, 2022, at 6 a.m., Keaney did not observe Stacey's vehicle at Short's Roxana home, which prompted Keaney to drive to Stacey's place of employment. Upon arrival, he observed Stacey's Jeep Wrangler parked at 6:30 a.m. parked in her employer's parking lot. Keaney did not take photos outside Stacey's place of employment "as there were other subjects out of their vehicles standing around on the business parking lot."

- On Wednesday, January 19, 2022, at 9:45 p.m., Keaney observed Stacey's Jeep Wrangler and a maroon truck, registered to Stacey's mother, Roselin Helfrich, parked at Short's Roxana home. Photos included in report.

- On Sunday, January 23, 2022, at 7 a.m., Keaney observed Stacey's Jeep Wrangler and the maroon truck parked at Short's Roxana home. Photos included in report.

- On Wednesday, January 26, 2022, at approximately 4:05 p.m., Keaney followed Stacey from her place of employment. At 4:25 p.m., Keaney observed Stacey arrive at Short's Roxana home in her Jeep Wrangler. Keaney testified that he observed Stacey open the mailbox and retrieve mail before she entered the residence with a key. The maroon truck was parked in driveway. Photos included in report. Also, on January 26, 2022, Keaney's report indicated that Roger informed him that Stacey "might be moving from the Roxana address" to Waterloo "to have her name on rental property to say she has an apartment/house to avoid saying she is cohabitating with another man." The report later indicated that Roger informed the investigators

5

on February 15, 2022, that Stacey rented a duplex in Waterloo.

- On Sunday, January 30, 2022, at 6:50 a.m., Keaney observed Stacey's Jeep Wrangler and the maroon truck parked at Short's Roxana home. Photos included in report.

- On Thursday, February 10, 2022, at 6:15 a.m., Keaney did not observe Stacey or Short's vehicles at Short's Roxana home. Keaney then drove to Stacey's place of employment, where he observed Stacey's Jeep Wrangler. No photos included in report.

- On Monday, February 21, 2022, at approximately 4 p.m., Keaney and Thomure followed Stacey from her place of employment to Short's Roxana home. The report indicated that Keaney and Thomure observed Stacey enter the home with a key. At approximately 5 p.m., Short arrived at the residence driving the maroon truck. Photos included in report.

- On Wednesday, February 23, 2022, Roger advised Keaney that Stacey rented a duplex located at 117 Roosevelt Ave., Waterloo, Illinois (Waterloo duplex). Keaney indicated in the report that he conducted "spot checks" of the Waterloo duplex between February 23, 2022, and March 5, 2022. Keaney testified that he drove by the Waterloo house "[a]t least two or three times" but never saw Stacey's Jeep Wrangler parked there. No photos of Waterloo duplex contained in report.

- On Tuesday, March 8, 2022, at 5:20 a.m., Keaney observed Stacey's Jeep Wrangler and the maroon truck parked outside Short's Roxana home. Photo included in report.

- On Saturday, March 12, 2022, at 6:30 a.m., Keaney observed Stacey's Jeep

6

Wrangler and the maroon truck parked outside Short's Roxana home. Photos included in report.

- On Tuesday, March 15, 2022, at 6 a.m., Keaney observed Stacey's Jeep Wrangler parked outside Short's Roxana home. Keaney also observed Stacey leave the residence. The maroon truck was not parked outside. Photos included in report.

- On Sunday, March 20, 2022, at 7:30 a.m., Keaney observed Stacey's Jeep Wrangler parked outside Short's Roxana home. The maroon truck was not parked outside. Photos included in report.

- On Tuesday, March 29, 2022, at 5:35 a.m., Keaney observed Stacey's Jeep Wrangler parked outside Short's residence. The maroon truck was not parked outside. Photo included in report.

- On Thursday, March 31, 2022, Keaney and Thomure observed Stacey leave her place of employment and arrive at Short's Roxana home at approximately 4:40 p.m. Photos included in report.

Keaney reiterated that he conducted surveillance in April 2022 on the Waterloo duplex that Stacey allegedly rented. Keaney testified that he visited this house "three to four times" in April 2022 "between" 4 p.m. and 8 p.m. after Stacey finished work. However, Keaney never saw Stacey at the Waterloo duplex.

¶ 14    On cross-examination, Keaney acknowledged that he did not document any surveilled visits to the Waterloo duplex, because he never saw Stacey's Jeep Wrangler at this home. Keaney admitted that he never checked Roselin's house in Waterloo, although Stacey informed Roger via text message[2] that she planned to split time between Roselin's and Short's homes following the

---

[2]Petitioner's Exhibit 3 included a text message between Roger and Stacey, wherein Roger asked

end of her lease at the Millstadt apartment. The following colloquy took place between Stacey's counsel and Keaney:

"Q. Okay. Then why did you not surveil her mother's address?

A. Because as I indicated sir from January the 5th of 2022 *** all through January, February, March she was always in Roxana, Illinois. There was no need to go to her mother's house when she was staying in Roxana."

Keaney confirmed that he surveilled Short's home with Thomure a total of 16 times. On redirect examination, Keaney reiterated that he never saw Stacey's vehicle in Waterloo, stating: "I never saw any evidence whatsoever that showed that she lived in Waterloo, Illinois." On recross examination, Keaney clarified that his report showed "around twenty five or more" days that he and Thomure surveilled Short's house and found Stacey's vehicle parked outside the residence.

¶ 15    B. Bob Thomure

¶ 16    Next, Roger's counsel called Thomure, a private investigator, who testified to the following. Thomure testified that he performed surveillance at Short's Roxana home on nine occasions and included the following observations:

- On Sunday, January 9, 2022, at 8 p.m., Thomure observed Stacey's Jeep Wrangler parked in the driveway of Short's Roxana home. Photo included in report.

- On Thursday, January 13, 2022, at 7:50 p.m., Thomure observed Stacey's Jeep Wrangler parked on the street in front of Short's Roxana home. The maroon truck was

_____

Stacey for her address to send the monthly maintenance check. Stacey responded, "I don't really have a new address—haven't found anything yet. I'm going to be staying either in Waterloo with my mom or sometimes with Jody. Is there any way of doing it electronically? Not sure if that is an option or not." Roger responded, "I like doing the check." The exact date of the text is not included in the text exchange; however, Roger testified on November 16, 2022, that the text message conversation took place sometime after December 8, 2021.

8

parked in the driveway. Photo included in report.

- On Thursday, January 20, 2022, at 5:28 a.m., Thomure observed Stacey's Jeep Wrangler parked on the street in front of Short's Roxana home. The maroon truck was parked in the driveway.

- On Thursday, January 20, 2022, at 4:20 p.m., Thomure observed Stacey arrive alone and enter Short's Roxana home. Photos included in the report.

- On Saturday, February 5, 2022, at 8 a.m., Thomure observed Stacey's Jeep Wrangler parked on the street in front of Short's Roxana home. The maroon truck was not present.

- On Monday, February 21, 2022, at approximately 4 p.m., Thomure and Keaney followed Stacey from her place of employment to Short's Roxana home. The report indicated that Keaney and Thomure observed Stacey enter the home with a key. At approximately 5 p.m., Short arrived at the residence driving the maroon truck. Photos included in report.

- On Friday, March 18, 2022, at 6 a.m., Thomure observed Stacey's Jeep Wrangler driving away from Short's Roxana home. Photos included in report.

- On Saturday, March 26, 2022, at 7 a.m., Thomure observed Stacey's Jeep Wrangler parked outside Short's Roxana home. The maroon truck was not present. Thomure indicated in the report: "It is believed that Colbert and Short returned the [maroon truck] to Colbert's parents. Short was off work due to some medical reasons therefore [he] did not need to utilize the vehicle." Photos included in report.

- On Thursday, March 31, 2022, from 4:05 p.m. to 4:41 p.m., Thomure and Keaney observed Stacey's Jeep Wrangler parked at Short's Roxana house after they followed

9

Stacey from her place of employment.

On cross-examination, Thomure acknowledged that he did not surveil either Stacey's Waterloo duplex or Roselin's home in Waterloo. In addition, Thomure testified that Roger never informed him that Stacey resided with her mother in Waterloo.

¶ 17   C. Stacey Colbert

¶ 18   Next, Roger's counsel called Stacey to testify as an adverse witness. Stacey testified that Roger paid maintenance to her "directly" from 2018 until December 2021. Despite this, she testified that she filed an income withholding order in December 2021 to garnish Roger's paycheck because it would be "easier."

¶ 19   Stacey testified that she dated Short from August 2019 to June 2022. With regard to her place of residence, Stacey testified that her landlord terminated her tenancy at the Millstadt apartment, effective December 8, 2021, prompting her to change her address. As such, Stacey requested her employer on December 7, 2021, to update her address from the Millstadt apartment to Short's Roxana home. Stacey also testified that she requested her employer to change her address on March 8, 2022, from Short's Roxana home to the Waterloo duplex that she started to lease on February 2, 2022. Stacey acknowledged that her 2021 W-2, 2021 state income tax return, and 2021 federal income tax return listed Short's Roxana home as her place of residence. Stacey also admitted that she never claimed her maintenance income as income on her tax returns.

¶ 20   Roger's counsel then engaged in a very detailed review of Stacey's monthly withdrawals and transactions from Stacey's checking account for food, gas, shopping, and entertainment in and around the Roxana area from 2018 through 2022. Although Stacey acknowledged withdrawing $200 to $400 at one time over the course of several days, she testified that she and Short took turns paying for dinner and entertainment. Stacey also acknowledged that in January 2021 she made

10

more charges on her debit card in Roxana than in any other location. Focusing specifically on the time period from November 2021 to April 2022, Stacey testified that she changed her address to Short's Roxana home with her bank from December 2021 to March 2022, with her bank statements reflecting this change for these months. From December 9, 2021, to January 9, 2022, Stacey confirmed that all charges took place online or in Roxana and Wood River, Illinois. Stacey testified that she often went to breakfast and dinner and socialized with Short with friends at the American Legion in Roxana.

¶ 21    Stacey also acknowledged that she engaged in a physical and romantic relationship with Short. The two, however, did not share keys to their residences, claiming that Short did not give her a key to his home but left the door unlocked. Short drove Roselin's maroon truck for approximately three months after his car was stolen. Stacey testified that the couple drove each other's vehicles. Stacey denied paying for rent, utilities, or groceries at Short's residence from 2019 to 2022. Stacey and Short vacationed together from August 31, 2020, to September 8, 2020, in Florida. Stacey testified that she paid $1467.23 and $281.37 for a hotel, but Short paid her cash to cover his half of the hotel expenses. Stacey testified that both of them paid for themselves on this trip. Stacey and Short celebrated Thanksgiving and Christmas together in 2020 and 2021. Stacey and Short purchased Christmas gifts for each other in 2020 and 2021 but only Stacey purchased Short a birthday gift during the course of their relationship. Stacey and Short also celebrated Stacey's daughter's twenty-first birthday and attended Short's daughter's college graduation together. In addition, Stacey and Short celebrated the Super Bowl, Mother's Day, and Fourth of July together. Stacey confirmed that it was common for she and Short to socialize with their families. Stacey acknowledged that Thomure personally served her with Roger's petition to terminate maintenance on April 18, 2022, at Short's Roxana home.

¶ 22    D. Roger Colbert

¶ 23    Next, Roger testified that he became suspicious concerning Stacey's residence after his daughters, who lived with Stacey, "complained to [him] that [Stacey] wasn't really looking for a place to [live]" in November 2021. Roger hired private investigators because he had a "gut feeling" Stacey was not living with her mother, Roselin, after Stacey "would not give [her address] to me" after asking via text. Roger stated, "So if she wouldn't give me an address of where to send the [maintenance] check that right there threw up a red flag in my mind."

¶ 24    On cross-examination, Roger acknowledged that Stacey texted him sometime after December 8, 2021, informing him that she would split time living with Roselin and Short. Roger acknowledged that Roselin's side entrance garage was not visible from the street. Thus, Roger confirmed that a vehicle parked on the side of Roselin's home was not visible from the street. In addition, Roger also acknowledged that he did not provide Keaney and Thomure with Roselin's address in Waterloo. When counsel asked why, Roger stated that he "knew she wasn't there" based on "what my kids were telling me that she was not there." Following Roger's testimony, the trial court reset the matter for a continued hearing.

¶ 25    On January 20, 2023, the trial court held the final hearing on Roger's petition to terminate maintenance. Stacey's counsel called her to testify first.

¶ 26    Stacey testified that she lived at the Waterloo duplex from February 2022 to the time of the hearing. Stacey testified that she dated Short from August 2019 until April 2022. Stacey and Short never engaged, exchanged rings, owned a joint bank account or held joint credit cards, shared keys to their residences, or purchased vehicles or furniture together. Stacey and Short never had access to each other's separate credit cards or bank accounts. Stacey and Short never paid for each other's

12

rent or mortgage, utilities, phone bills, or home and vehicle repairs. Stacey admitted that Short bought her a tire for her vehicle one time.

¶ 27 After her lease to the Millstadt apartment ended in November 2021, Stacey testified that she looked for a new apartment but could not find one because "it was a bad time of the year[,] and it was winter." As a result, Stacey testified that she lived with her parents in Waterloo and also spent the night at Short's Roxana home. Stacey and one of her daughters moved to the Waterloo duplex in February 2022, where Stacey, alone, paid her rent and utility bills. Stacey testified that she bought a storage unit for her furniture after she moved from the Millstadt apartment in December 2021. Stacey testified that she never intended to marry Short during the course of their relationship, stating: "We dated and we you know just went out and had a good time together but it was never anything that was going to end up being a marriage thing or really serious." Stacey also testified that she helped Short in 2022 at his home for six weeks when he left the hospital after experiencing health issues. Stacey testified that she did not know about Roger's desire to terminate maintenance until Thomure served her in April 2022.

¶ 28 On cross-examination, Stacey admitted that she changed her address with her employer to Short's Roxana home, even though she testified earlier that she lived with her parents in December 2021. Stacey admitted again that she changed her legal address to Short's Roxana home on her 2021 federal and state tax returns. Stacey also indicated that she purchased a bed for her Waterloo duplex in May 2022, even though she moved there in February 2022.

¶ 29 On February 28, 2023, the trial court entered an order in favor of Stacey. In considering the exhibits and testimony presented, the court determined that the evidence did not support a showing that Stacey resided on a continuing and conjugal basis with Short. The court concluded that Stacey "maintained a separate residence at her mother's home [in Waterloo] from December

13

2021 until she rented a new residence in February 2022 and admitted to having spent numerous over-nights at her paramour's home." The court also determined that Stacey, for employment and tax purposes, changed her address to Short's Roxana home during that time because "she did not have a permanent residence." The court continued to state:

> "Even if it were determined that [Stacey] and [Short] lived together, no evidence was presented to show any co-mingling of their funds in any way, let alone in a way that could show a *de*[ ]*facto* husband/wife relationship. [Stacey] and [Short] own no property together including real estate, vehicles or any other personal property. The parties have never co-mingled bank accounts, credit card accounts nor is there any evidence that they have ever applied for joint credit. Neither [Stacey] nor [Short] had access to the other's credit cards or bank accounts at any time. The affirmative evidence presented by [Stacey] is that she paid her own rent and utilities for her residence commencing in February 2022."

Moreover, the court determined that the evidence showed that Short and Stacey traveled together on one vacation, although both paid their own way, and spent some, but not all, holidays together. The court noted that, although Short bought Stacey a tire for her vehicle, she gave him cards but never received any gifts from Short. The court also found it important that Stacey and Short never engaged or exchanged rings. According to the court, there was no evidence that "any relationship existed other than an intimate dating relationship between" Stacey and Short. As such, the court denied Roger's petition to terminate maintenance. Due to the income disparities, the court, pursuant to section 508 of the Marriage Act (750 ILCS 5/508 (West 2020)), granted Stacey's petition for contribution to attorney fees, ordering Roger to pay $3000 towards Stacey's attorney fees and costs. Roger did not file a motion to reconsider the court's order. Roger filed a timely notice of appeal.

14

¶ 30                                    II. Analysis

¶ 31    Roger argues on appeal that the trial court erred by failing to terminate his maintenance obligation, where the court determined that Roger failed to meet his burden of proof that Stacey cohabited with Short on a continuing and conjugal basis. In addition, Roger asserts that the court erred by ordering Roger to pay a majority of Stacey's attorney fees. We address Roger's contentions in turn.

¶ 32    Section 510(c) of the Marriage Act provides that "the obligation to pay future maintenance is terminated *** if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." 750 ILCS 5/510(c) (West 2020). The obligation to pay future maintenance would terminate by operation of law on the date the court finds that "conjugal cohabitation" began, not when the petition to terminate maintenance is filed. *Id.*; *In re Marriage of Snow*, 322 Ill. App. 3d 953, 957 (2001). The party who paid maintenance would then be entitled to reimbursement for all payments made after the date that cohabitation began. *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 40. The purpose of section 510(c) is not to control public morals. *Id.* Rather, "[t]he rationale behind termination of maintenance when resident, continuing, conjugal cohabitation exists is [to prevent] the inequity created when the ex-spouse receiving maintenance becomes involved in a husband-and-wife relationship but does not legally formalize it, with the result that he or she can continue to receive maintenance." *In re Marriage of Herrin*, 262 Ill. App. 3d 573, 577 (1994). "Where the relationship has achieved a permanence sufficient for the trial court to conclude that it has become a substitute for marriage, equitable principles warrant a conclusion that the spouse has abandoned his or her rights to support from the prior marriage ***." (Internal quotation marks omitted.) *In re Marriage of Weisbruch*, 304 Ill. App. 3d 99, 105 (1999).

15

¶ 33    The party seeking the termination of maintenance has the burden of establishing that the receiving spouse is cohabitating with another. *In re Marriage of Susan*, 367 Ill. App. 3d 926, 929 (2006). To establish that Stacey must reimburse Roger for maintenance payments, Roger must prove that Stacey engaged in a "resident, continuing conjugal" relationship. 750 ILCS 5/510(c) (West 2020). In short, Roger would need to prove that Stacey and Short engaged in a *de facto* marriage or a substitute for a marriage. *Miller*, 2015 IL App (2d) 140530, ¶ 40. To determine if that burden has been met, a court looks to the totality of the circumstances and considers the following nonexhaustive list of factors: "(1) the length of the relationship; (2) the amount of time spent together; (3) the nature of activities engaged in; (4) the interrelation of personal affairs (including finances); (5) whether they vacation together; and (6) whether they spend holidays together." *Id.* The list of factors is not exhaustive as each maintenance case is factually distinct. *Id.*; *Susan*, 367 Ill. App. 3d at 930.

¶ 34    On appeal, a reviewing court will not reverse a trial court's ruling on a petition to terminate maintenance based on the existence of a *de facto* marriage unless that ruling is against the manifest weight of the evidence. *Susan*, 367 Ill. App. 3d at 929-30. A decision is against the manifest weight of the evidence if the opposite conclusion is clearly evident or if the decision is unreasonable, arbitrary, or not based on the evidence. *In re Marriage of Nord*, 402 Ill. App. 3d 288, 294 (2010).

¶ 35    We turn to the evidence presented at the hearing in support of Roger's claim that Stacey received maintenance payments at a time when she engaged in a *de facto* marriage with Short. On December 6, 2018, Roger became contractually obligated to pay permanent maintenance to Stacey. Evidence presented at the hearing indicated that Roger promptly paid maintenance to Stacey directly, without any payment arrearages. However, on December 28, 2021, Stacey's attorney filed an income withholding order requesting the court garnish Roger's wages to fulfill his monthly

16

maintenance obligations. Stacey's request with the trial court listed Short's Roxana home as Stacey's address.

¶ 36    Stacey first testified on November 16, 2022, that she dated Short from August 2019 through April 2022. Stacey then testified on January 20, 2023, that she dated Short from August 2019 through June 2022. Although Stacey testified that she did not intend to marry Short, Stacey and Short engaged in a long-term, romantic, and physical relationship. We note that the trial court correctly determined that no evidence showed that they owned real estate, vehicles, or personal property together, although testimony and evidence existed that Short paid Stacey $200 for a couch, Short bought Stacey a tire, Stacey and Short drove each other's car, and Short drove Roselin's maroon truck during their relationship. In addition, there is no evidence that Stacey and Short comingled bank or credit card accounts.

¶ 37    We disagree with the trial court, however, where the court concluded that Stacey "maintained a separate residence at her mother's home [in Waterloo] from December 2021 until she rented a new residence in February 2022 and admitted to having spent numerous over-nights at her paramour's home." There is simply no evidence—besides Stacey's own testimony—to support this finding. First, Keaney testified that he did not surveil Roselin's home in Waterloo because "[t]here was no need to go to her mother's house when [Stacey] was staying in Roxana." Keaney testified that he surveilled Short's Roxana home on 16 separate occasions. In addition, the evidence showed that Keaney surveilled Short's Roxana home early in the morning, at night, and on the weekends. On two occasions (January 14, 2022, and February 10, 2022), Keaney did not observe Stacey's Jeep Wrangler or see her at Short's Roxana home. Testifying specifically to his surveillance on February 10, 2022, Keaney testified that he "drove immediately" to her place of

employment and verified that her vehicle was there.[3] Keaney also testified that he conducted surveillance "three to four times" in April 2022 on Stacey's Waterloo duplex from 4 p.m. and 8 p.m. following her workday. Keaney never saw Stacey at the Waterloo duplex. Moreover, Thomure personally served Stacey in April 2022—not at Roselin's Waterloo home or at Stacey's Waterloo duplex, where she recently signed a lease—but at Short's Roxana home. The evidence demonstrated that Thomure knew where to find Stacey—at Short's Roxana home.

¶ 38     Moreover, the evidence demonstrated that Stacey was not forthright in providing her address to Roger in December 2021 when he asked her, via text, where to send the monthly maintenance check. The trial court acknowledged that Stacey, for employment and tax purposes, changed her address to Short's Roxana home from December 2021 to February 2022 because "she did not have a permanent residence." Stacey, however, informed Roger via text in December 2021 that she would "stay[ ] either in Waterloo with my mom or sometimes with Jody." At this time, however, the evidence showed that she listed Short's Roxana home as her legal address with her employer, the trial court, her banking institution, and on her 2021 state and federal income taxes. Despite this evidence, Stacey testified that she did not have a key to Short's Roxana home. Again, the testimony and evidence—besides Stacey's own testimony—demonstrate otherwise. First, Keaney and Thomure observed Stacey arrive and leave the residence on multiple occasions without Short. Keaney observed Stacey on January 26, 2022, open the mailbox, retrieve mail, and then let herself into the home with a key. In addition, Keaney and Thomure observed Stacey enter Short's home with a key on February 21, 2022. Importantly, the evidence demonstrated that

---

[3]Keaney indicated in the surveillance report that he drove immediately to Stacey's place of employment on both January 14, 2022, and February 10, 2022, after he did not see her vehicle or the maroon truck at Short's Roxana home early in the morning. He testified, however, at the November 16, 2022, hearing that there was only one time when no vehicles were present, and he drove to Stacey's place of employment.

18

Stacey's request to garnish Roger's paycheck, eliminating the need for him to send a physical check to a mailing address, took place the same month that she moved from the Millstadt apartment and three weeks after she requested her employer to update her legal address as Short's Roxana home.

¶ 39   Based on this information, we know that Stacey cohabited with Short from December 2021 through at least February 2022 during which she received maintenance payments from Roger. Moreover, based on the evidence produced at the hearing, we conclude that Stacey attempted to hide "the true nature of the relationship" to preserve Stacey's maintenance payments. *Miller*, 2015 IL App (2d) 140530, ¶ 66.

¶ 40   Understanding that Stacey cohabitated with Short does not answer the question of whether she did so "on a resident, continuing conjugal basis." 750 ILCS 5/510(c) (West 2020). Based on the above information, it is clear that the length of the cohabitation lasted several months. We now turn to the remaining five factors outlined in *Miller*. First, there existed evidence detailing the amount of time that Stacey and Short spent together. In particular, Roger's counsel elicited very detailed testimony from Stacey regarding her transactions and withdrawal history from August 2019 through April 2022, which demonstrated that Stacey spent much time and money with Short in and near Roxana, where the two had dinner and engaged in entertainment-related activities with each other and friends, especially at the American Legion. Next, Stacey and Short vacationed together to Florida, celebrated holidays, exchanged gifts at Christmas and birthdays, and attended special events and birthday dinners for each other's children together. Stacey even testified that it was common for her and Short to socialize with each other's families. Stacey also testified that she cared for Short for six weeks in 2022 when he left the hospital following health issues.

19

¶ 41 Although there was no evidence that Stacey and Short were engaged or exchanged rings, there existed evidence of a long-term, committed relationship that lasted over many months, especially when Stacey, claiming she lived with her parents, changed her legal address with her employer, her bank institution, the trial court, and on her state and federal tax returns to receive mail at Short's Roxana home. Given the evidence presented before the trial court, we cannot conclude that, at some point in time, Stacey and Short did not have a *de facto* marriage, where the evidence showed they were together on a "resident, continuing conjugal basis." 750 ILCS 5/510(c) (West 2020). Accordingly, we conclude that the trial court's order denying Roger's petition to terminate maintenance was contrary to the manifest weight of the evidence.

¶ 42 Lastly, we address Roger's argument that the trial court erred by ordering Roger to pay the majority of Stacey's attorney fees, pursuant to section 508 of the Marriage Act (*id.* § 508). We agree with Roger.

¶ 43 Section 508 of the Marriage Act governs attorney fees in postdecree dissolution proceedings. *Blum v. Koster*, 235 Ill. 2d 21, 45 (2009). An award of attorney fees under section 508(a) is discretionary (*In re Marriage of Haken*, 394 Ill. App. 3d 155, 161 (2009)), and the trial court may order one party to contribute to the other party's fees in a postjudgment proceeding after the court considered the relative financial resources of the parties. 750 ILCS 5/508(a) (West 2020). When considering a party's postjudgment fee petition, the trial court must consider section 503(j) of the Marriage Act, which requires the court "to consider certain factors set forth in section 503(d) and, when maintenance has been awarded, the factors set forth in section 504(a)." *In re Marriage of Chapa*, 2022 IL App (2d) 210772, ¶ 52 (citing *In re Marriage of Heroy*, 2017 IL 120205, ¶ 20). We will not reverse the trial court's decision to grant fees unless we find the court abused its discretion. *In re Marriage of Schneider*, 214 Ill. 2d 152, 174-75 (2005). A trial court abuses its

discretion when it acts arbitrarily, without conscientious judgment, or, in view of all of the circumstances, exceeds the bounds of reason and ignores recognized principles of law, resulting in substantial justice. *In re Marriage of Marsh*, 343 Ill. App. 3d 1235, 1240 (2003).

¶ 44 Here, the trial court's judgment awarded maintenance to Stacey. Thus, the court was required to consider the factors set forth in section 504(a) of the Marriage Act (750 ILCS 5/504(a) (West 2020)) when determining whether to grant Stacey's November 15, 2022, petition for contribution to attorney fees (*id.* § 508(a)). The court's February 28, 2023, order fails to consider the 504(a) factors.[4] Rather, the court noted that it considered the factors set forth in section 508 when awarding Stacey attorney fees, stating that based on the "the income disparity between the parties," Stacey "does not have any ability to pay her attorney's fees and [Roger] has such an ability."

¶ 45 We presume that the trial court relied on the same basis for awarding Stacey maintenance in 2018 at the time the court entered the judgment of dissolution of marriage order. While those factors may be appropriate consideration in this context, "the Act's attorney-fee provisions clearly direct a trial court to consider *all* of the relevant factors." (Emphasis in original.) *Chapa*, 2022 IL

---

[4]Section 504 factors include: "(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage; (2) the needs of each party; (3) the realistic present and future earning capacity of each party; (4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage; (5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought; (6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment; (6.1) the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment; (7) the standard of living established during the marriage; (8) the duration of the marriage; (9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties; (10) all sources of public and private income including, without limitation, disability and retirement income; (11) the tax consequences to each party; (12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse; (13) any valid agreement of the parties; and (14) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/504(a)(1) (West 2020).

21

App (2d) 210772, ¶ 55. The record demonstrates that the court failed to do so in this instance. We also note that a review of the financial documents before the trial court indicated that Stacey's 2022 gross annual income totaled $34,560 (Respondent's Exhibit 8), not including variable overtime pay and $24,540 in annual maintenance income paid by Roger. The testimony demonstrated that Stacey never claimed her maintenance income as income on her taxes from 2018 to the time of the trial, as evidenced by her own testimony. In addition, Roger's 2022 gross annual income totaled $105,161.52 (Respondent's Exhibit 13), not including overtime, holiday pay, or the deduction of $24,540 in annual maintenance payments to Stacey. Despite having this information, the court did not explain the basis for its decision before concluding, as stated above, that an "income disparity between the parties" necessitated an award of attorney fees for Stacey. Based on the foregoing, we cannot conclude that an award of attorney fees is appropriate here. We, thus, conclude that the court abused its discretion by ordering Roger to contribute $3000 to Stacey's attorney fees.

¶ 46    Accordingly, we conclude that the trial court's order denying Roger's petition to terminate maintenance was against the manifest weight of the evidence, where the court found Stacey did not cohabitate on a resident, continuing, and conjugal basis with Short while receiving maintenance support from Roger. We also conclude that the court abused its discretion by failing to consider and mention the factors set forth in section 504(a), as required by section 508, when it granted Stacey's petition for contribution to attorney fees.

¶ 47                                III. Conclusion

¶ 48    For the foregoing reasons, we reverse the judgment of the circuit court of St. Clair County denying Roger's petition to terminate maintenance and ordering him to contribute to Stacey's attorney fees. We remand the cause to the circuit court with directions to determine the date that

22

Stacey began cohabitating with Short and then also calculate the amount of reimbursement that Stacey owes Roger based on the court's finding.

¶ 49    Reversed; caused remanded with directions.